## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

**SAMANTHA WILLIAMS and DAKOTA FISHER, individually and on behalf of all others similarly situated, and WES PIGOTT,**

      **Plaintiffs,**

**v.**

**D'ARGENT FRANCHISING, LLC, D'ARGENT CONSTRUCTION, LLC, D'ARGENT COMPANIES, LLC, THOMAS GIALLONARDO, III, JUSTIN GIALLONARDO, and XYZ INSURANCE COMPANY**

      **Defendants.**

**DOCKET NO.: 1:20-cv-01501**

**JUDGE DAVID C.  JOSEPH**

**MAGISTRATE JOSEPH H. L. PEREZ-MONTES**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## RENEWED MOTION FOR COLLECTIVE ACTION CERTIFICATION

# **TABLE OF CONTENTS**

I.    BACKGROUND ............................................................................................................. 1

   1.   D'Argent Franchising's business practices........................................................... 5

   2.   D'Argent Construction's business practices. ....................................................... 7

   3.   D'Argent Companies did not hire employees until January 2021. ...................... 8

   4.   The three LLC Defendants operate separately..................................................... 9

   5.   The Individual Defendants managed D'Argent Construction. ............................. 9

   6.   Plaintiffs engaged in fraud and wrongdoing during their employment. ........... 10

II.   LEGAL STANDARD ................................................................................................. 13

III.  ARGUMENT .............................................................................................................. 14

   1.   The Court should exercise its discretion to deny certification.......................... 14

   2.   Certification and notice are improper because Plaintiffs' definition of
     "Putative Class Members" is unclear and overbroad......................................... 15

   3.   Certification and notice are improper because the Putative Opt-In Plaintiffs
     are too individualized......................................................................................... 16

   4.   Certification is not appropriate because Plaintiffs have presented no proof
     of similarly situated employees. ........................................................................ 18

     a.   Samantha Williams' testimony proves that she is an inappropriate representative.... 20

     b.   Justin Giallonardo's testimony disproves that there was a common practice
       or policy of any of the LLC Defendants of not paying overtime............................... 21

   5.   Plaintiffs should not be permitted to conduct further discovery....................... 23

   6.   Even if the Court issues notice, Plaintiffs' proposed parameters are overbroad. ............. 24

IV.   CONCLUSION............................................................................................................ 24

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Clark v. Contract Land*,
No. H-20-2620, 2021 U.S. Dist. LEXIS 170254 (S.D. Tex. Aug. 2, 2021) ...........................19

*Clay v. Huntington Ingalls Inc*.,
No. 09-7625, 2011 U.S. Dist. Lexis 155351 (E.D. La. Sept. 29, 2011) .................................18

*Green v. Plantation of Louisiana, LLC*,
2010 U.S. Dist. LEXIS 133441 (W.D. La. Nov. 24, 2010), *report and recommendations adopted,* 2010 U. S. Dist. LEXIS 133449 (W.D. La. Dec. 15, 2010). .......................................................................................................................17

*Hebert v. TechnipFMC USA, Inc.*,
No. 4:20-CV-2059, 2021 U.S. Dist. LEXIS 63484 (S.D. Tex. Feb. 5, 2021) .........................19

*Helgason v. Perry's Rests., Ltd.*,
No. 3:20-CV-1573-S, 2021 U.S. Dist. LEXIS 218134 (N.D. Tex. Nov. 10, 2021) ........................................................................................................................23

*Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165 (1989)......................................................................................1, 13, 14

*In re JPMorgan Chase & Co.*,
916 F.3d 494 (5th Cir. 2019) ................................................................................13

*Lusardi v. Xerox Corp.*,
118 F.R.D. 351 (D.N.J. 1987).................................................................................2

*Mike v. Safeco Ins. Co. of Am.*,
274 F.Supp.2d 216 (D. Conn. 2003)......................................................................15

*Mooney v. Aramco Services Co.*,
54 F.3d 1207 (5th Cir. 1995) ...................................................................................1

*Powell v. One Source EHS, L.L.C.*,
No. 20-161-SDD-RLB, 2021 WL 4227064 (M.D. La. Sept. 16, 2021) .................................15

*Schnelle v. Chevron U.S.A. Inc.*,
No. MO:20-CV-112-DC-RCG, 2021 U.S. Dist. LEXIS 127419 (W.D. Tex. Jan. 28, 2021), *report and recommendation adopted*, No. MO:20-CV-112-DC, 2021 U.S. Dist. LEXIS 127417 (W.D. Tex. Mar. 7, 2021). ..............................................15, 16

*Segovia v. Fuelco Energy LLC*,
  SA-17-CV-1246-JKP, 2021 U.S. Dist. LEXIS 101258 (W.D. Tex. May 28,
  2021) .........................................................................................................................15

*Smith v. Manhattan Mgmt. Co., LLC*,
  2015 WL 4097267 (E.D. La. July 7, 2015) ............................................................16

*Snively v. Peak Pressure Control, LLC*,
  314 F. Supp. 3d 734 (W.D. Tex. 2018)...................................................................15

*Swales v. KLLM Transport Services, LLC*,
  985 F.3d 430 (5th Cir. 2021) ........................................................................ *passim*

*Valcho v. Dall. Cnty. Hosp. Dist.*,
  574 F. Supp. 2d 618 (N.D. Tex. 2008) ...................................................................19

*Xavier v. Belfor USA Group, Inc.*,
  585 F. Supp. 2d 873 (E.D. La. Sept. 23, 2008).........................................................1

*Young v. Energy Drilling Co.*,
  No. 4:20-cv-1716, 2021 WL 1550343 (S.D. Tex. Apr. 20, 2021)...........................16

**Statutes**

Fair Labor Standards Act Section .......................................................................... *passim*

**Other Authorities**

Fed. Rule Civ. P. 23 ....................................................................................................1

MAY IT PLEASE THE COURT:

Defendants, D'Argent Franchising, LLC ("D'Argent Franchising"), D'Argent Construction, LLC ("D'Argent Construction"), D'Argent Companies, LLC ("D'Argent Companies") (collectively, the "LLC Defendants") and Thomas Giallonardo, III and Justin Giallonardo (collectively, the "Individual Defendants") (overall, "Defendants") respectfully submit the following response to Plaintiffs Samantha Williams, Dakota Fisher and Wes Pigott's ("Plaintiffs") Renewed Motion for Collective Action Certification ("Renewed Motion for Certification"), dated May 10, 2022.[1]

## I.      BACKGROUND

Section 216(b) of the Fair Labor Standards Act ("FLSA") provides that an employee seeking redress for violations of the FLSA may maintain a cause of action on "behalf of himself . . . and other employees similarly situated."[2]  It is plaintiffs' burden to demonstrate the propriety of conditional certification for the purpose of issuing court-facilitated notice to proposed class members.[3] In contrast to a Rule 23 class action, putative plaintiffs who wish to participate in a § 216(b) collective action must affirmatively "opt-in" by filing with the court a written consent to become a party.[4] When a named plaintiff establishes that there is a collection of "similarly situated" employees, a court has the discretion to facilitate notice to potential collective members with instructions on their right to opt into the lawsuit.[5]

---

[1] Dkt. 77 (Plaintiffs' May 10, 2022 Renewed Motion for Certification).
[2] 29 U.S.C. § 216(b).
[3] *Xavier v. Belfor USA Group, Inc.*, 585 F. Supp. 2d 873, 877-78 (E.D. La. Sept. 23, 2008).
[4] *Id.*
[5] *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995).

On January 21, 2021, the two-step procedure for collective certification established by the Fifth Circuit in *Lusardi*[6] was overturned in a seminal opinion, *Swales v. KLLM Transport Services, LLC*.[7] In *Swales*, the Fifth Circuit recognized that the word "certification" does not appear anywhere in the text of the FLSA statute and that harm was caused by overly broad conditional certification of a collective and subsequent notice.[8] In place of two-step certification, the Fifth Circuit set forth a new standard requiring the court to identify and authorize at the outset of the case the preliminary discovery necessary to determine whether a group of employees is similarly situated.[9] The plaintiffs bear the burden of demonstrating that potential opt-in plaintiffs are similarly situated and that certification is proper.[10] *Swales* ushered in a total change in the FLSA collective action process in the Fifth Circuit.

Despite the Fifth Circuit's unequivocal new mandate, plaintiffs' original April 7, 2021 motion asked this Court to ignore the binding precedent of *Swales* and conditionally certify a collective using the rejected two-step certification process.[11] The Court denied Plaintiffs' original motion as premature.[12] Since then, defendants have filed Counterclaims against plaintiff Wes Pigott ("Pigott"), detailing the widespread fraud that he engaged in while employed by D'Argent Franchising.[13]

The Court must deny Plaintiffs' Renewed Motion for Certification because plaintiffs' claims fail substantively. Plaintiffs are attempting to certify a single collective of all employees of

---

[6] *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).
[7] *Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021).
[8] *Id.* at 434.
[9] *Id.* at 443.
[10] *Id*. at 443, n. 5.
[11] Dkt. 27 (Plaintiffs' April 7, 2021 Motion for Conditional Certification and Equitable Tolling, or in the Alternative, Equitable Tolling).
[12] Dkt. 50 at pp. 6-7 (Court's November 2, 2021 Order denying Plaintiffs' April 7, 2021 Motion for Conditional Certification and Equitable Tolling, or in the Alternative, Equitable Tolling).
[13] Dkt. 54 (Defendants' Counterclaims Against Plaintiff Wes Pigott, dated November 23, 2021).

three separate entities, whether exempt or non-exempt, ostensibly to determine whether any of the employees are owed unpaid overtime. However, plaintiffs' putative collective as currently defined requires this court to determine the following legal issues collectively:

(1) whether non-exempt employees' overtime pay was improperly reduced through purposeful cutting of time from checks;[14] *and*

(2) if such improper cuts occurred, whether they were part of a policy that spanned all separate supervisory chains across all of the separate business entities, including a CC's Coffeehouse, a Huddle House, and a real estate and construction business, despite those entities' entirely separate operations;[15] *and*

(3) whether certain employees classified as salaried-exempt were improperly misclassified and should have received overtime during their period of misclassification;[16] *and*

(4) whether other employees classified as salaried-exempt who were properly classified nevertheless had their exempt status destroyed through improper deductions.[17]

Plaintiffs are asking to litigate these entirely different classes of employees with entirely different legal issues for all employees of three separate entities: (i) D'Argent Companies, which had no employees at all during the relevant time period; (ii) D'Argent Franchising, which currently operates a CC's Coffeehouse and previously also operated a separate Huddle House; and (iii) D'Argent Construction, a wholly separate business housed in its own office building that manages real estate and construction projects. Each of these entities has its own timekeeping system; payroll provider; management structure and managers; location; schedule; handbook; job titles and job descriptions; employment policies; and each performs entirely different business services, yielding entirely different job duties and worker schedules. Plaintiffs improperly base their broad, proposed opt-in definition on their unfounded assumption that the LLC Defendants operate as an integrated

---

[14] Dkt. 1 at ¶ 78(B) (Plaintiffs' November 21, 2020 Complaint).
[15] *Id.* ¶¶ 11-12.
[16] *Id.* ¶¶ 33, 78(B).
[17] *Id.* ¶ 29.

enterprise. But this is an issue that has not yet been litigated, and Defendants vehemently object to Plaintiffs' continued characterization of the LLC Defendants as such.[18]

As set forth in the declarations and other evidence attached hereto, the Named Plaintiffs simply are not similarly situated to all employees in the putative collective. In fact, they are not even similarly situated to each other. Plaintiff Samantha Williams ("Williams") was an hourly Huddle House server—not a management trainee as Plaintiffs allege[19]—employed by D'Argent Franchising; plaintiff Dakota Fisher ("Fisher") was an hourly Job-Site Coordinator working on the construction side of D'Argent Construction (notably employed for less than a month).[20] Neither of the Named Plaintiffs ever worked at CC's Coffeehouse. D'Argent Companies did not have employees at the time, so neither of the Named Plaintiffs ever worked for D'Argent Companies. Neither of the Named Plaintiffs alleges to be an improperly misclassified salaried-exempt employee. Neither of the Named Plaintiffs alleges to be properly classified as salaried-exempt but with salary pay improperly reduced. It would be difficult for Plaintiffs to certify a collective across even a single one of the LLC Defendants based on its attempt to mix the various FLSA legal claims, including cut time, misclassification, and improper deductions. Their request to do so across the three separate LLC Defendants and the two Individual Defendants further complicates the issues, and it is not an appropriate use of the FLSA "similarly situated" procedural vehicle.

Further, Plaintiffs' only evidentiary support for their assertion of a "no-overtime" rule are declarations executed by two former employees who have admitted to and/or are being prosecuted

---

[18] Defendants disagree with Plaintiffs' assertion that "[e]ach of the putative class members worked . . . jointly for Defendants' collective benefit." (Dkt. 77 at p. 18.) Dakota Fisher worked for D'Argent Construction. Samantha Williams worked for D'Argent Franchising at the Huddle House. They did not work for any other LLC Defendants, and there is no evidence to the contrary.

[19] Not once in Williams' deposition did she describe herself as a management trainee, despite questions regarding her job title, role and duties.

[20] The third Named Plaintiff, Wes Pigott, is not a representative of members of the proposed class but is separately suing for retaliation under the FLSA. (Dkt. 1, ¶ 5).

for stealing from the company.[21] Richard Molina ("Molina") admitted to theft from D'Argent Franchising. He is currently being prosecuted and awaits trial for his crime. Pigott lived with and engaged in a sexual relationship with Williams, his direct report, and they conspired together to defraud D'Argent Franchising of thousands of dollars through several fraudulent schemes. Williams gave birth to Pigott's child in mid-2021.[22]

Pigott also engaged in unlawful conduct involving an inmate at Rapides Parish Detention Center, Tony Hunter ("Hunter").[23] Pigott transmitted unlawful payments to Hunter through D'Argent Franchising's payroll.[24] Pigott also conducted suspicious night-time drives through the detention center parking lot, for which Pigott was detained by Rapides Parish Sheriff's Office deputies and questioned.[25]

Finally, Fisher, an employee of D'Argent Construction for less than a month, never returned his company-provided tires or cell phone. Fisher also allowed his cell service to be charged to the company for months, despite requests to cease and desist.

Given the above and the following arguments, Defendants respectfully request that this Court deny Plaintiffs' Renewed Motion for Certification.

### 1.   D'Argent Franchising's business practices.

D'Argent Franchising is an entity that currently owns and runs a CC's Coffeehouse located at 2481 LA-28, in Pineville, Louisiana.[26] During the relevant time period, D'Argent Franchising owned and ran two separate franchises—the CC's Coffeehouse and a Huddle House located at

---

[21] Dkt. 77 at pp. 11-13.
[22] Williams Dep. Tr. at 8:7-14 (testifying that her child is Pigott's); Dkt. 54 at ¶ 34.
[23] Dkt. 54 at ¶ 59.
[24] *Id*. at ¶¶ 60-65.
[25] *Id*. at ¶¶ 66-74.
[26] Exhibit 1 at ¶ 13 (Declaration of former Accountant and Human Resources Manager ("HR" Decl.")); Exhibit 2 at ¶ 5 (Declaration of Justin Giallonardo ("Giallonardo Decl.")).

2710 S. MacArthur Drive in Alexandria, Louisiana.[27] D'Argent Franchising is an entirely separate entity from D'Argent Companies and D'Argent Construction. Huddle House employees' timekeeping, schedule, and pay rate data was managed by their local, on-site managers.[28] Similarly, the CC's Coffeehouse employees' timekeeping, schedule and pay rate data was managed by their local, on-site managers.[29] Hourly non-exempt employees of the Huddle House clocked in and out using timekeeping software called Aloha.[30] Hourly non-exempt employees of the CC's Coffeehouse clocked in and out using a different software called Partech/Brinks.[31] Payroll for Huddle House and CC's employees was processed through Heartland, a third-party payroll vendor, up until November 2020.[32] Around that time, Paychex, a different third-party payroll vendor, began processing payroll for D'Argent Franchising employees.[33] D'Argent Franchising employees were paid twice a month.[34] D'Argent Franchising employees were subject to employment policies in a D'Argent Franchising employee handbook, including a timekeeping policy ("D'Argent Franchising's Policy").[35] Pursuant to D'Argent Franchising's Policy, working off the clock was prohibited, and overtime pay was "awarded to all non-exempt hourly workers for work performed over 40 hours in any given weekly time period."[36]

---

[27] D'Argent Franchising sold the Huddle House in October 2021.
[28] Exhibit 1, Hr. Decl. at ¶ 16; Exhibit 3 at ¶ 9 (Declaration of CC's Coffeehouse Barista ("CC's Barista Decl.")); Exhibit 4 at ¶ 9 (Declaration of Huddle House Cook 1 ("HH Cook 1 Decl.")); Exhibit 5 at ¶ 4 (Declaration of Huddle House Cook 2 ("HH Cook 2 Decl.")); Exhibit 6 at ¶ 4 (Declaration of Huddle House Server ("HH Server Decl.")).
[29] Exhibit 1, HR Decl. at ¶ 16.
[30] Exhibit 1, HR Decl. at ¶ 9; Exhibit 4, HH Cook 1 Decl. at ¶ 4.
[31] Exhibit 1, HR Decl. at ¶ 9; Exhibit 3, CC's Barista Decl. at ¶ 4.
[32] Exhibit 1, HR Decl. at ¶ 10.
[33] *Id*.
[34] Exhibit 3, CC's Barista Decl. at ¶ 3; Exhibit 4, HH Cook 1 Decl. at ¶ 3.
[35] Exhibit 2, Giallonardo Decl. at ¶ 4, Ex. C; Exhibit 1, HR Decl. at ¶ 13.
[36] Exhibit 2, Giallonardo Decl. at ¶ 4, Ex. C at p. DEF-FLSA-000041.

## 2.   D'Argent Construction's business practices.

D'Argent Construction is an entirely separate business from D'Argent Companies and D'Argent Franchising that does work in real estate and construction, generally headquartered in an office located at 1460 Centre Court in Alexandria, Louisiana.[37] D'Argent Companies is a distinct company that had no employees during the relevant time period.[38] D'Argent Companies hired employees for the first time in January 2021.[39] Sometimes in company documents, the branding of "D'Argent Companies" is used to refer to both the real estate and construction sides of D'Argent Construction.[40] However, everyone who works in real estate or construction, or both, is an employee of D'Argent Construction.[41] D'Argent Construction employees' timekeeping, schedule and pay rate data was managed by Justin Giallonardo ("J. Giallonardo"), Thomas Giallonardo, III, and Thomas Giallonardo, IV.[42]  Hourly non-exempt employees of D'Argent Construction kept time by completing paper time sheets, which their supervisors would enter into the Sage Contractor 100 Daily Field Reports software.[43] Payroll for D'Argent Construction employees was processed through Sage Contractor 100 accounting and business management software.[44] Salaried exempt employees of D'Argent Construction did not clock in or out, but their paid time off requests would be approved by J. Giallonardo.[45]

D'Argent Construction employees were subject to employment policies in a D'Argent Companies employee handbook, including timekeeping policies.[46] Pursuant to D'Argent

---

[37] Exhibit 1, HR Decl. at ¶¶ 2, 15.
[38] *Id*. at ¶ 15.
[39] Dkt. 68-6 at p. 3 (Defendant D'Argent Companies, LLC's February 18, 2022 Answer to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents Under Proposed Initial Discovery Plan).
[40] Exhibit 1, HR Decl. at ¶ 15.
[41] *Id*.
[42] *Id*. at ¶ 17.
[43] *Id*. at ¶ 8.
[44] *Id*. at ¶ 10.
[45] *Id*. at ¶ 11.
[46] Exhibit 2, Giallonardo Decl. at ¶ 3, Ex. B; Exhibit 1, HR Decl. at ¶ 13.

Construction's Timekeeping Policy ("D'Argent Construction's Policy," contained in a handbook entitled "D'Argent Companies," which covers employees of both the real estate and construction side of D'Argent Construction), all employees were required to enter their hours worked accurately, and to notify the company of any pay discrepancies, unrecorded or mis-recorded work hours, or missed breaks.[47] Further, pursuant to D'Argent Construction's Policy, hourly non-exempt employees were compensated on a time and a half basis for all hours worked in excess of 40 in a workweek.[48] The policy sets forth that even unapproved overtime "must be paid."[49] Only salaried, exempt employees do not receive overtime pay, pursuant to the policy.[50]

### 3.   D'Argent Companies did not hire employees until January 2021.

D'Argent Companies hired employees for the first time in January 2021.[51] Prior to January 2021, D'Argent Companies employed no employees but was used as a trade name for D'Argent Construction's real estate and construction business.[52] D'Argent Companies employees are paid semi-monthly, and payroll is administered through payroll services provider QuickBooks.[53] D'Argent Companies' handbook notes in the overtime section that "[e]xempt salaried employees will not be paid on an overtime basis and may be asked to work extra hours as business demands."[54] It also states that non-exempt employees will be paid on a time and a half basis for overtime work, *i.e.*, time worked beyond a 40-hours in a workweek.[55]

Fisher's employment with D'Argent Construction ended in March 2020. Fisher was never coded as a salaried, non-exempt employee. D'Argent Franchising terminated Williams'

---

[47] Exhibit 2, Giallonardo Decl. at ¶ 3, Ex. B at p. DEF-FLSA-000018.
[48] *Id*. at ¶ 3, Ex. B at p. DEF-FLSA-000019.
[49] *Id*.
[50] *Id*.
[51] Dkt. 68-6 at p. 3.
[52] *Id*.; *see also* Exhibit 1, HR Decl. at ¶ 10.
[53] Dkt. 86-6 at p. 4.
[54] Exhibit 10, D'Argent Companies Handbook Overtime Policy.
[55] *Id.*

employment in August 2020 and Pigott's in September 2020. Williams was never coded as a salaried, non-exempt employee. Accordingly, D'Argent Companies employees cannot be similarly situated to proposed representatives Fisher and Williams.

### 4. The three LLC Defendants operate separately.

The LLC Defendants have completely separate operations in totally separate industries. D'Argent Construction employees did not go to the Huddle House, CC's Coffeehouse, or the 1460 Centre Court office to perform work.[56] The servers and cooks of the Huddle House and the CC's Coffeehouse baristas did not perform any work for D'Argent Construction or work at the office located at 1460 Centre Court.[57] The Huddle House employees also did not work at CC's Coffeehouse, and similarly CC's Coffeehouse employees did not work at the Huddle House.[58] D'Argent Companies did not hire employees until January 2021.[59]

### 5. The Individual Defendants managed D'Argent Construction.

J. Giallonardo supervised the employees at D'Argent Construction.[60] He worked daily in the office at D'Argent Construction, unless he was at an off-site meeting, for example with a potential client.[61] Neither J. Giallonardo nor Thomas Giallonardo, III went to either the Huddle House or CC's Coffeehouse on any kind of regular basis.[62] Those two locations were part of a separate entity, D'Argent Franchising, and had separate management that worked in the locations with other employees there under the manager's supervision.[63] D'Argent Franchising had a

---

[56] Exhibit 1, HR Decl. at ¶ 14.
[57] *Id.*; *see also* Exhibit 3, CC's Barista Decl. at ¶ 7; Exhibit 4, HH Cook 1 Decl. at ¶ 7.
[58] The one exception is Richard Molina. He managed CC's Coffeehouse and the Huddle House at the same time for a very brief period after Pigott's termination resulted in a vacant manager position at the Huddle House. *See* Exhibit 3, CC's Barista Decl. at ¶ 6; Exhibit 4, HH Cook 1 Decl. at ¶ 6.
[59] Dkt. 68-6 at p. 3.
[60] Exhibit 1, HR Decl. at ¶ 12.
[61] *Id.*
[62] *Id.* at ¶ 13; Exhibit 3, CC's Barista Decl. at ¶¶ 10, 11; Exhibit 4, HH Cook 1 Decl. at ¶¶ 10, 11; Exhibit 6, HH Server Decl. at ¶ 16.
[63] Exhibit 1, HR Decl. at ¶ 13.

separate timekeeping system, a separate payroll system, a separate handbook, and different policies from D'Argent Construction.[64] No one has ever told the managers of D'Argent Franchising to cut overtime hours from employees' paychecks, and hourly non-exempt employees are paid overtime when they work overtime.[65]

### 6.   Plaintiffs engaged in fraud and wrongdoing during their employment.

Plaintiffs and the declarant Molina engaged in widespread theft and fraud during their employment. The extent of Pigott's wrongdoing is outlined in Defendants' Counterclaims against Pigott.[66] Both Molina and Pigott hired their romantic partners. Molina hired his girlfriend Taylor Smith ("Smith"). During her deposition, Williams confirmed that she and Pigott met when they were both working at a different Huddle House on the Fort Polk military base.[67] Pigott hired Williams at the D'Argent Franchising Huddle House, and they began dating not long thereafter.[68] Williams gave birth to Pigott's child, and he is almost one year old.[69] Williams and Pigott currently live together and did when they were working together.[70]

Pigott and Molina both continued to supervise Williams and Smith as direct reports, without disclosing the conflict of interest at any time. Pigott never communicated his intent to make Williams a management trainee—a position that did not exist because there was only one manager.[71] Upon information and belief, Pigott paid Williams a higher management rate because

---

[64] *Id*.
[65] Exhibit 7 at ¶¶ 4-5 (Declaration of Huddle House Manager ("HH Manager Decl.")); Exhibit 8 at ¶¶ 4-5 (Declaration of CC's Coffeehouse Manager ("CC's Manager Decl.")); Exhibit 2, Giallonardo Decl. at ¶ 12.
[66] Dkt. 54 (Defendants' November 23, 2021 Counterclaims against Plaintiff Wes Pigott).
[67] Exhibit 11, Williams Deposition Transcript ("Dep. Tr.") at 15:17 – 16:25.
[68] *Id*. at 7:25 – 8:6 ("I've been with [Pigott] probably about three years maybe.").
[69] *Id*. at 8:7-14 (testifying that her child is Pigott's).
[70] Id. at 7:13 – 8:2.
[71] *See* Exhibit 12, Justin Giallonardo Dep. Tr. 36:11-22 (there were no assistant managers at the Huddle House, only one manager).

she was his girlfriend, and not for a legitimate purpose.[72] Similarly, Molina entered fraudulent time stamps into the timekeeping system and paid Smith for many hours she did not work because she was his romantic partner.

Pigott and Molina manipulated hours in the timekeeping system without authorization and stole money from employee's paychecks.[73] They also fraudulently purchased supplies for less than the amount they declared on the accounting books and pocketed the difference.[74] Subsequently, Molina was arrested and charged with theft from D'Argent Franchising.[75] He admitted that he had stolen from the company, stating "there's nothing to justify it," "there's nothing I can say or will say," and said he could not disagree with the decision to call the police and report the theft.[76] He said that "that's how it's supposed to go" when he was told he would go to jail, noting "that's the right thing to do."[77] Molina then talked about how going to jail would make it hard for him to cancel the debt, which he admitted he owed.[78] Molina also stated that "in regards to that time theft," he was "not going to say it's ok, because it's not . . . you always want to compare apples to apples and oranges to oranges.[79] What I did, I worked for it. . . the difference is Wes [Pigott] puts his weight on other people to collect the money that he gets. Me, I put it on myself . . . ."[80] Molina stated that his theft and Pigott's theft were "comparable."[81]

---

[72] *See*, *e.g.*, *id.* at 176:15-17 ("[T]his is Wes being a bad manager. He was having his girlfriend do truck orders for him because he was too lazy.").

[73] Exhibit 6, HH Server Decl. at ¶¶ 10, 21; Exhibit 5, HH Cook 2 Decl. at ¶ 14; Exhibit 2, Giallonardo Decl. at ¶ 7; *see also* Dkt. 54 at ¶ 44.

[74] Exhibit 5, HH Cook 2 Decl. at ¶¶ 10, 11; *see also* Dkt. 54 at ¶ 48.

[75] Exhibit 2, Giallonardo Decl. at ¶ 7; Exhibit 9; *see also* Dkt. 27-2 at ¶ 18 (Molina Declaration).

[76] Exhibit 2, Giallonardo Decl. at ¶ 7.

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* This conversation was preserved in a contemporaneously made recording. *Id.*

Pigott also has engaged in unlawful conduct involving Hunter, an inmate at Rapides Parish Detention Center ("RPDC").[82] Hunter performed work for D'Argent Franchising as part of RPDC's work release program, reporting to Pigott.[83] On or about March 28, 2020, Hunter ceased performing work for D'Argent Franchising because the work release program was stopped due to COVID-19 precautions.[84] Pursuant to his pay stubs, Hunter's last pay period for hours worked in person ended on March 28, 2020.[85] However, D'Argent Franchising later discovered that at the time Hunter stopped working, Pigott had Hunter execute a direct deposit form on April 30, 2020, after which Pigott direct deposited money from D'Argent Franchising into Hunter's personal bank account, although he was no longer working.[86] Hunter was paid $335.62 on April 30, 2020; $215.24 on May 13, 2020; $645.38 on May 27, 2020; and $645.38 again on June 10, 2020.[87] Around the same time period of the fraudulent pay transfers, on the night of April 20, 2020, Pigott was detained by deputies for driving suspiciously slow through the RPDC parking lot, which is a common practice by individuals seeking to smuggle contraband into the facility.[88] Pigott had his minor daughter in the front seat, and three young men riding unlawfully in the bed of his pickup truck.[89] When questioned by officers, Pigott stated that he wanted to show his minor daughter where work release employees lived, including Hunter, which the officers found suspicious given the time of night (approximately 9:00 pm).[90]

---

[82] Dkt. 54 at ¶ 59.
[83] Exhibit 2, Giallonardo Decl. at ¶ 9; *see also* Dkt. 54 at ¶ 60.
[84] Exhibit 2, Giallonardo Decl. at ¶ 9; *see also* Dkt. 54 at ¶ 61.
[85] Exhibit 9 at ¶ 6 (Susan Desmond Declaration ("Desmond Decl.")), Ex. B; *see also* Dkt. 54 at ¶ 62.
[86] Exhibit 9, Desmond Decl. at ¶ 5, Ex. A; *see also* Dkt. 54 at ¶ 63.
[87] Dkt. 54 at ¶ 64.
[88] Exhibit 9, Desmond Decl. at ¶ 7, Ex. C at pp. 1-2, 5; Dkt. 54 at ¶ 66.
[89] Dkt. 54 at ¶ 71.
[90] Exhibit 9, Desmond Decl. at ¶ 7, Ex. C at pp. 3, 5; Dkt. 54 at ¶¶ 72-73.

Significantly, Pigott also sexually harassed at least one former Huddle House cook and one former Huddle House server.[91] This sexual harassment ranged from sexual touching and sexual comments to sexual exploitation.[92] According to the former server, if a female server at the Huddle House rebuffed Pigott's sexual advances, he would retaliate by removing her from the schedule, cutting her hours, and/or terminating her.[93] The server refused Pigott, and he cut her hours in retaliation.[94]

Finally, Fisher, who was an employee of D'Argent Construction for less than a month, never returned his company cell phone and allowed his cell service to be charged to the company for months, despite requests to stop.[95]

## II.    LEGAL STANDARD

This case was filed on November 21, 2020, only a couple of months before the Fifth Circuit's *Swales* decision. As noted above, *Swales* addressed the framework that district courts should employ to determine whether a case can properly proceed and be certified as a collective action under § 216(b) of the FLSA. The Fifth Circuit embraced the following "interpretive first principles":

> (1) the FLSA's text, specifically § 216(b), which declares (but does not define) that only those "similarly situated" may proceed as a collective; and (2) the Supreme Court's admonition that while a district court may "faclitat[e] notice to potential plaintiffs" for case-management purposes, it cannot signal approval of the merits or otherwise stir up litigation.[96]

The Fifth Circuit emphasized that these commands on district courts are unequivocal, and they have significant implications:

---

[91] Dkt. 54 at ¶ 76.
[92] *Id*. at ¶ 80.
[93] *Id*. at ¶ 77.
[94] *Id*. at ¶ 78.
[95] Exhibit 9, Desmond Decl. ¶ 8, Ex. D.
[96] *Swales*, 985 F.3d at 434 (citing *Hoffman-LaRoche*, 493 U.S. at 169; *In re JPMorgan Chase & Co.*, 916 F.3d 494, 500-02 (5th Cir. 2019)).

> In our view, a district court *must rigorously scrutinize* the realm of "similarly situated" workers and *must do so from the outset of the case*, not after a lenient, step-one "conditional certification." Only then can the district court determine whether the requested opt-in notice will go to those who are actually similar to the named plaintiffs.[97]

The Fifth Circuit further underscored the need for district courts to conduct such rigorous scrutiny from the beginning of the case, including assessment of the merits of the claims, in light of the inherent dangers posed by collective actions. These dangers include the intensification of settlement pressure on the defendant and stirring up litigation by sending notice to employees who are not similarly situated and do not belong in the case.[98] The instant action is a great example of when the Court should exercise its discretion to deny certification due to the dangers warned by the Fifth Circuit.

### III.    ARGUMENT

### 1.   The Court should exercise its discretion to deny certification.

District courts have the discretionary power to conditionally certify a collective action and to authorize the sending of notice to potential class members pursuant to § 216(b) of the FLSA, but that certification is by no means mandatory.[99] Instead, as the Fifth Circuit emphasized in *Swales*, the power to authorize notice must be exercised with discretion and only in appropriate cases.[100] The Court's discretion is constrained by the very language of § 216(b)—only individuals who are "similarly situated" can proceed collectively.[101] And Plaintiffs bear the burden of proving

---

[97] *Swales*, 985 F.3d at 434 (emphasis added).
[98] *Id*. at 441.
[99] *See Hoffman-La Roche*, 493 U.S. at 169.
[100] *Swales*, 985 F.3d at 443 ("The bottom line is that the district court has broad, litigation-management discretion here. To be sure, that discretion is cabined by the FLSA's 'similarly situated' requirement and the Supreme Court's decision in *Hoffman La-Roche*.").
[101] *Id*. at 434-35.

similarity.[102] The relevant inquiry, then, is whether this case is an appropriate case for the Court to exercise its discretion to facilitate notice.[103] It is not.

### 2. Certification and notice are improper because Plaintiffs' definition of "Putative Class Members" is unclear and overbroad.

Plaintiffs seek collective certification of the following class of "Putative Opt-In Plaintiffs":

> All employees who are or were employed by Defendants D'Argent Franchising, LLC, D'Argent Construction, LLC, or D'Argent Companies, LLC at any point from three years prior to the date of filing this Complaint to the present (November 21, 2017 to present), who have worked over 40 hours in at least one workweek from November 21, 2017 to the present, and who were subject to the pay practices of D'Argent Franchising, LLC, D'Argent Construction, LLC, or D'Argent Companies, LLC during that time.

Defendants dispute the relevance of D'Argent Companies' pay practices because D'Argent Companies hired employees for the first time in January 2021, months after Fisher's employment with D'Argent Construction ended and Williams' employment with D'Argent Franchising terminated. The inclusion of D'Argent Companies in the proposed collective is improper and renders the definition overbroad. Further, the definition is inherently overbroad because it requests certification of a collective of all employees of any of the three LLC Defendants who worked over 40 hours in at least one workweek and were subject to the pay practices of any of the three LLC Defendants. Plaintiffs attempt to diminish the importance of the vast difference that exists between the three LLC Defendants' employees, including job duties, geographic locations, supervision, salary, pay structure and mechanisms, and rogue managers.[104] In *Schnelle v. Chevron U.S.A. Inc.*,

---

[102] *Id*. at 443, n. 14.
[103] *Mike v. Safeco Ins. Co. of Am.*, 274 F.Supp.2d 216, 219 (D. Conn. 2003).
[104] *See Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 739 (W.D. Tex. 2018) (noting that courts consider "the opt-in plaintiffs' job duties, geographic location, supervision, and salary."). The cases cited by Plaintiffs for the proposition that post-Swales courts have exercised broad discretion in certifying collectives are distinguishable. Dkt. 77 at p. 10 & n. 19. *Segovia v. Fuelco Energy LLC*, SA-17-CV-1246-JKP, 2021 U.S. Dist. LEXIS 101258, at *21-23 (W.D. Tex. May 28, 2021) is distinguishable because the case was decided on a motion by defendants to decertify class and the parties had already engaged in extensive discovery. In *Powell v. One Source EHS, L.L.C.*, No. 20-161-SDD-RLB, 2021 WL 4227064 (M.D. La. Sept. 16, 2021), the court only found that factual differences—including base compensation, dates worked, work performed, and job duties—were irrelevant to the certification question

for example, the court denied certification of a broadly defined class of all individuals who "were paid a day rate," where such a broad definition failed to provide sufficient notice of the class the plaintiff sought to represent, and plaintiff failed to show that "the putative class members performed similar job duties."[105]

Plaintiffs' proposed alternative sub-classes: (1) D'Argent restaurant workers; (2) D'Argent office workers; and (3) D'Argent construction workers—will not cure the defects in their collective certification motion.[106] These proposed sub-classes are equally unclear, overbroad, and insufficient because they are based on the premature and improper legal conclusion that Defendants act as one joint employer/integrated enterprise, "D'Argent."

The Court must deny certification of the proposed collective of Putative Opt-In Plaintiffs and must not accept as an alternative for certification purposes the three sub-classes proposed by Plaintiffs.

### 3. Certification and notice are improper because the Putative Opt-In Plaintiffs are too individualized.

This Court may not issue notice to the putative collective because the individuals in the collective are too individualized. Notice to a putative collective must be denied when the group includes individuals with myriad individualized circumstances.[107] When the policies and practices governing the employees in the putative collective are "neither homogenous, nor lend themselves

---

because plaintiffs argued that non-exempt employees were paid straight time for overtime, so the physical and factual setting of the employees' work were not material. In *Young v. Energy Drilling Co.*, No. 4:20-cv-1716, 2021 WL 1550343 (S.D. Tex. Apr. 20, 2021), whether employees were similarly situated turned on whether bonuses were non-discretionary and were required to be calculated into the regular rate of pay.

[105] *Schnelle v. Chevron U.S.A. Inc.*, No. MO:20-CV-112-DC-RCG, 2021 U.S. Dist. LEXIS 127419 (W.D. Tex. Jan. 28, 2021), *report and recommendation adopted*, No. MO:20-CV-112-DC, 2021 U.S. Dist. LEXIS 127417 (W.D. Tex. Mar. 7, 2021).

[106] Dkt. 77 at p. 18.

[107] *See Smith v. Manhattan Mgmt. Co., LLC*, 2015 WL 4097267, at *8 (E.D. La. July 7, 2015) (denying notice when "collective treatment would be impractical because individualized issues, personal to the various potential opt-in plaintiffs, predominate.").

to collective inquiry," then notice must not issue because there will be too many particularized determinations as to liability.[108]

Here, the putative collective has far too many varied and individualized members:

- **Separate Unrelated Businesses**: the putative collective includes all job titles for all employees who worked at a CC's Coffeehouse or a Huddle House (D'Argent Franchising), for a company that performs some real estate work and some construction work (D'Argent Construction), or for a company (D'Argent Companies) that did not have employees while Named Plaintiffs were employed by one of the three LLC Defendants.
- **Exemption Status**: the putative collective includes exempt and non-exempt employees, which would require the court to examine distinct legal issues not common across the class, including whether non-exempt employees' overtime pay was improperly cut; whether certain employees classified as salaried-exempt were improperly misclassified; and whether other properly classified salaried-exempt employees nevertheless had their exempt status destroyed through improper deductions.
- **Separate Timekeeping and Payroll Mechanisms and Policies**: the putative collective includes employees subject to four different timekeeping systems; three payroll systems; totally separate supervisory chains; separate scheduling; and different handbooks with different policies.
- **Different Job Titles and Job Duties**: the putative collective would ask this court to collectively examine legal issues for all cooks, servers, and managers of a restaurant (Huddle House); all baristas and managers of a coffee shop (CC's Coffeeshop); and all administrative assistants, office coordinators, construction job-site coordinators, project coordinators, painters, maintenance technicians, superintendents, project managers, receptionists, HR managers, accounting staff, laborers, maintenance managers, office assistants, personal assistants, and IT managers of a real estate and construction business.
- **Rogue Managers**: the putative collective includes all employees of any of the LLC Defendants who worked 40 hours in at least one workweek from November 21, 2017 to present and who were subject to the pay practices of any of the LLC Defendants, but Richard Molina and Wes Pigott were rogue managers who edited the time and payroll records of the employees they managed at CC's Coffeehouse and the Huddle House. The putative collective would ask this court to collectively examine the propriety of each edit by Molina or Pigott of a D'Argent Franchising employee's hours/time-punches and the resultant pay.

---

[108] *Green v. Plantation of Louisiana, LLC*, 2010 U.S. Dist. LEXIS 133441, at *22 (W.D. La. Nov. 24, 2010), *report and recommendations adopted,* 2010 U. S. Dist. LEXIS 133449 (W.D. La. Dec. 15, 2010).

The Named Plaintiffs' attempt to represent the putative collective also fail through lack of representation. Williams was an hourly Huddle House server employed by D'Argent Franchising; Fisher was an hourly Job-Site Coordinator who worked on the construction side of D'Argent Construction (notably employed for less than a month).[109] Neither of the Named Plaintiffs ever worked at CCs Coffeehouse. Neither of the Named Plaintiffs worked at D'Argent Companies because it did not employ any individuals at that time. Neither of the Named Plaintiffs alleges to be an improperly misclassified salaried-exempt employee. Neither of the Named Plaintiffs alleges to be properly classified as salaried-exempt but with salary pay improperly reduced.

The "similarly situated" standard "necessarily encompasses the notion that certain aspects of the case must be triable in a representative fashion that does not eviscerate the defendants' right to effectively defend the claims on the merits."[110] Further, the "collective action mechanism of the FLSA serves no utility if thousands of plaintiffs join together in one lawsuit only to then try their claims individually."[111] To allow notice to issue to the putative collective as defined would absolutely yield a series of mini-trials on the dozens of individual issues present in this case and serves no purpose except to eviscerate Defendants' right to a full defense on the merits.

### 4. Certification is not appropriate because Plaintiffs have presented no proof of similarly situated employees.

Plaintiffs suggest that they need additional documents to solidify their argument in favor of conditional certification.[112] During the parties' hearing with Magistrate Judge Perez-Montes on May 19, however, Plaintiffs' counsel suggested that Plaintiffs are confident in their Renewed

---

[109] The third Named Plaintiff, Wes Pigott, is not a representative of member of the proposed class but is separately suing for retaliation under the FLSA. (Dkt. 1, ¶ 5).
[110] *Clay v. Huntington Ingalls Inc*., No. 09-7625, 2011 U.S. Dist. Lexis 155351, at *16 (E.D. La. Sept. 29, 2011).
[111] *Id.*
[112] Dkt. 77 at p. 7, n. 1 (arguing that the "currently pending Motion to Compel (ECF No. 68) which might substantially alter the evidence regarding this Motion.").

Motion for Certification as-is. Plaintiffs claim that Fisher and Williams are both aware of co-workers who were allegedly not paid overtime, but they have not provided a single name in discovery or in their Motion. Plaintiffs attempt to gloss over the importance of employees' management, job duties, job descriptions, work locations, and pay, because those characteristics would only highlight the significant differences between Fisher and D'Argent Construction employees and Williams and D'Argent Franchising employees.[113] It is clear that Plaintiffs cannot present proof that there are any employees similarly situated to the Fisher or Williams.

The only declarations that Plaintiffs referenced in support of their Motion are from Molina and Pigott. Molina is an averred criminal being prosecuted for stealing from D'Argent Franchising. Molina's declaration cannot be trusted. Pigott is a counterclaim-defendant in this action for the same reason. Pigott and his girlfriend/the mother of his child are both Named Plaintiffs in this action. They are biased in favor of their own self-interest, not the interests of the Putative Opt-In Plaintiffs. Pigott's declaration cannot be trusted. In *Clark v. Contract Land*, for example, the court recommended that the motion for conditional certification be denied and finding that the two declarations provided were not sufficient to meet the burden for conditional certification.[114] Here, Molina's and Pigott's declarations—compared with the eight (8) employee declarations provided by Defendants—are not only untrustworthy, they are insufficient to meet the threshold burden for collective action certification.[115] Because Plaintiffs have not shown and cannot show that there are

---

[113] *See, e.g.*, *Hebert v. TechnipFMC USA, Inc.*, No. 4:20-CV-2059, 2021 U.S. Dist. LEXIS 63484, at *17-18 (S.D. Tex. Feb. 5, 2021) (denying motion for conditional certification, post-*Swales*, where the members of the proposed class, all of whom were subject to the defendant's alleged mis-classification of them as exempt from overtime under the professional exemption, had different job titles and different job descriptions).

[114] *Clark v. Contract Land*, No. H-20-2620, 2021 U.S. Dist. LEXIS 170254, at *14 (S.D. Tex. Aug. 2, 2021).

[115] *See Valcho v. Dall. Cnty. Hosp. Dist.*, 574 F. Supp. 2d 618, 622-23 (N.D. Tex. 2008) (denying motion for conditional certification where plaintiff did not produce any evidentiary support beyond bare allegations contained in complaint and personal declaration after three months of discovery).

"similarly situated" employees across the three LLC Defendants, the Court must deny conditional certification.

### a. Samantha Williams' testimony proves that she is an inappropriate representative.

Williams' testimony only enhances the argument against certification. Williams testified that she never worked for D'Argent Construction and does not know any of the employees who work there.[116] She also testified that she never "stepped foot" in the office at 1460 Centre Court, only sitting in the parking lot once while Pigott dropped off a deposit.[117]

She admitted that Pigott was responsible for scheduling at the Huddle House.[118] When asked whether J. Giallonardo told Pigott not to schedule employees for overtime, Williams responded, "that's between him and Justin" and admitted that she did not know.[119] Williams also admitted that even though her payroll records showed her working 20+ hours in one day, she did not work that many hours and asked, "who would even work that?"[120] She further admitted that J. Giallonardo insisted on employees' hours worked being accurately reflected in the payroll system.[121] Williams confirmed that she never heard J. Giallonardo say that he would not pay employees for hours worked.[122] And she admitted that when she started working at the Huddle House, she was paid overtime.[123] Williams could not pinpoint when she allegedly no longer received overtime.[124] And Williams never told J. Giallonardo when she was not paid overtime.[125]

---

[116] Williams Dep. Tr. at 23:12-14, 24:3-5.
[117] *Id*. at 23:15-23.
[118] *Id*. at 23:9-11.
[119] *Id*. at 28:10-13.
[120] *Id*. at 30:16-20.
[121] Williams Dep. Tr. at 32:20-24 ("Q: So Justin said, 'Make sure the times are accurate in the payroll system'; is that correct?" A: That's – yes. You got to make sure everything's accurate . . . .").
[122] *Id*. at 34:6-9 ("Q: Justin, did you ever . . . hear him say, 'I'm not gonna pay for hours worked'? A: No.").
[123] *Id*. at 50:9-19.
[124] *Id*. at 50:20-23.
[125] *Id*. at 52:10-13.

Williams even continued to work at the Huddle House after her termination on August 15, 2020. In discussing photographs of her working in the Huddle House kitchen on August 31, 2020, Williams stated that she went in to help Pigott.[126] But she admitted that the cooking, prepping, and cleaning that she did that day were tasks that other employees would typically have performed.[127]

Defendants have already detailed the inappropriate subordinate and supervisor sexual relationship between Williams and Pigott.[128] Williams' testimony and the photographs of her working at the Huddle House, with Pigott present, even after her employment with D'Argent Franchising ended, solidify the allegations that they worked in tandem to defraud Defendants. Williams is neither similarly situated to other D'Argent Franchising Huddle House employees (or CC's employees), nor is she an appropriate representative given her history with Pigott—who acted as a rogue manager and edited D'Argent Franchising employees' time for his own benefit and that of his family, including his children and his girlfriend, Williams.

**b.  Justin Giallonardo's testimony disproves that there was a common practice or policy of any of the LLC Defendants of not paying overtime.**

J. Giallonardo's testimony clarifies many points that Plaintiffs misconstrued in their Renewed Motion for Certification. First, he clarified that Fisher's payments in the short time that he worked for D'Argent Construction were not reflective of how other D'Argent Construction employees were paid.[129] Plaintiffs allege that Fisher "was not alone" and that "his co-workers were also denied any overtime pay."[130] But Fisher has failed to identify any such co-workers.  Fisher's

---

[126] *Id.* at 37:18 – 41:3.

[127] *Id.*

[128] *See* Section I(6), *supra.*

[129] Justin Giallonardo Dep. Tr. 87:6-16 ("Q: What's different from Mr. Fisher and other D'Argent Construction employees" A: A total amount of different things, but this guy . . . wasn't an honest man. There's a lot of things wrong with this person. And, you know, this is . . . an outlier to the normal business that we run. So . . . this is a bad situation. We handled it the best way we could."); *see also* 88:16-19 ("Q: So everyone else other than Dakota Fisher received overtime pay that worked for D'Argent Construction? A: Yes.").

[130] Dkt. 77 at p. 15.

inability to do so shows that similarly existed co-workers do not exist. Given J. Giallonardo's testimony, Fisher's bad faith behavior, and Fisher's limited employment with D'Argent Construction, he cannot be a proper representative.

Second, J. Giallonardo provided context to the text messages cited to by Plaintiffs in their Motion. J. Giallonardo did not tell Pigott to zero overtime.[131] He told Pigott "to remember that we don't want overtime for December" because Pigott "had a very big problem with overtime, taking advantage of overtime."[132] J. Giallonardo warned Pigott that he needed to "watch [his] overtime" because he was "affecting the labor numbers" by "not scheduling properly."[133] Further, "[n]o business can run with a lot of overtime," so "if you have a lot of overtime that means you're not managing properly. You need to schedule properly."[134] J. Giallonardo emphatically stated that, "everyone is entitled to overtime. That's never changed."[135] But it is the manager's job to hire and schedule sufficient employees to staff work as needed, approving overtime work only when necessary (during Covid, for example, when employee numbers were limited).[136]

Third, J. Giallonardo walked through the LLC Defendants' former and current policies regarding overtime. When D'Argent Franchising still owned the Huddle House, there were four handbooks in place: one for D'Argent Companies, one for D'Argent Construction, one for CC's Coffeehouse, and one for the Huddle House.[137] The handbooks all provided that non-exempt employees would be paid time and a half for overtime hours worked over 40. There was no common practice or policy within any of the individual LLC Defendants, or an overarching practice or policy of all three LLC Defendants, of not paying employees for overtime hours.

---

[131] J. Giallonardo Dep. Tr. at 105:7-8.
[132] *Id*. at 105:7-8: 21-24.
[133] *Id*. at 107:24 – 108:4.
[134] *Id*. at 108:18-22.
[135] *Id*. at 120:2-16.
[136] J. Giallonardo Dep. Tr. at 120:2-16.
[137] Id. at 63:15-18.

### 5.  Plaintiffs should not be permitted to conduct further discovery.

In the first footnote of Plaintiffs' Renewed Motion for Certification, Plaintiffs note that because their motion to compel, "might substantially alter the evidence" supporting conditional certification, Plaintiffs "reserve the right, subject to court approval, to supplement this Motion once the motion to compel is resolved."[138] Defendants disagree with this alternative argument. Plaintiffs filed their Renewed Motion for Certification while their motion to compel was pending and did not request an extension. Plaintiffs claim that there is "abundant evidence" of an alleged pay scheme across all three LLC Defendants.[139] Their counsel also admitted during the motion to compel hearing that Plaintiffs are confident that they have sufficient evidence to support the Renewed Motion for Certification. Plaintiffs believed that they had sufficient evidence to file this Motion, so their arguments must be judged based on the evidence currently before the Court.

This case has been pending for a year and a half, and the parties have already engaged in sufficient preliminary written discovery and depositions. Plaintiffs admit this in their Renewed Motion for Certification. There is no amount of additional discovery that will change the testimony of Williams and the nature of her claims. The same would be true of Fisher had the parties agreed to take more than one deposition in the pre-notice discovery period. By their very nature, Plaintiffs' claims required an individualized factual inquiry involving the particular circumstances of each employee. Defendants should not be forced to incur further expenses in discovery that will not change the clear result—that collective certification is inappropriate.[140]

---

[138] Dkt. 77 at p. 7, n. 1.

[139] *Id*. at p. 6. Plaintiffs even list the evidence that they allege supports their Renewed Motion for Certification and assert that the listed evidence and analysis establish a "common pay scheme." *Id*. at p. 7.

[140] *See Helgason v. Perry's Rests., Ltd.*, No. 3:20-CV-1573-S, 2021 U.S. Dist. LEXIS 218134, at *13 (N.D. Tex. Nov. 10, 2021) (denying motion to issue notice and noting that "[h]aving had the opportunity to conduct discovery on the issue of certification, it is not clear to the Court that additional discovery will help Plaintiffs demonstrate that they and members of the proposed collective are similarly situated."); *see also* Dkt. 73 (Defendants' May 3, 2022 Opposition to Plaintiffs' Motion to Compel).

**6.    Even if the Court issues notice, Plaintiffs' proposed parameters are overbroad.**

As discussed above, this is not an appropriate case for collective treatment and the Court must deny Plaintiffs' request to authorize notice to "all employees" of the LLC Defendants who worked over 40 hours in one workweek from November 21, 2017 to present. Accordingly, the Court need not reach any issues pertaining to the proposed form or manner of notice presented by Plaintiffs. Defendants reserve the right to lodge objections to the form and manner of notice, as appropriate.

## IV.    CONCLUSION

In *Swales*, the Fifth Circuit directed district courts to "rigorously enforce" the FLSA's "similarly situated" requirement, and to make the determination as to whether the case is appropriate for collective treatment as early as possible.[141] Otherwise, individuals who are not "similarly situated" to the named plaintiffs and who should not be in the case may nevertheless join the case, with all the attendant expenses, unnecessary use of judicial and party resources, and undue settlement pressure. For all the reasons discussed above, the Plaintiffs have not met their burden to prove that a class of "similarly situated" employees exists across all three separate LLC Defendants that would warrant collective treatment. Certification and notice are not appropriate, and Plaintiffs' Renewed Motion for Certification must be denied in its entirety.

---

[141] *Swales*, 985 F.3d at 441, 443.

Respectfully submitted,

*/s/ Susan Fahey Desmond*
Susan Fahey Desmond (Bar # 25380)
Susan.Desmond@jacksonlewis.com
Katelyn W. Harrell (Bar # 35164)
Katelyn.Harrell@jacksonlewis.com
Rachel T. Gulotta (Bar # 37706)
Rachel.Gulotta@jacksonlewis.com
**JACKSON LEWIS P.C.**
601 Poydras Street, Suite 1400
New Orleans, Louisiana  70130
Telephone:      (504) 208-1755
Facsimile:       (504) 208-1759
**COUNSEL FOR DEFENDANTS**
**D'ARGENT FRANCHISING, LLC,**
**D'ARGENT CONSTRUCTION, LLC,**
**D'ARGENT COMPANIES, LLC,**
**THOMAS GIALLONARDO, III, AND**
**JUSTIN GIALLONARDO**

25