b

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

SAMANTHA WILLIAMS, ET AL.,          CIVIL DOCKET NO. 1:20-CV-01501
Plaintiffs

VERSUS

D'ARGENT FRANCHISING,
L.L.C., ET AL.,          MAGISTRATE JUDGE PEREZ-MONTES
Defendants

---

### RULING AND ORDER

Before the Court are three motions filed by Plaintiffs Dakota Fisher ("Fisher"), Wesley T. Pigott ("Pigott"), and Samantha Williams ("Williams"): (1) a Motion to Compel Discovery and for Attorney Fees (ECF No. 68); (2) a Motion to Certify Collective Action (ECF No. 77); and (3) a Motion for Equitable Tolling of Putative Class Members' FLSA Claims (ECF No. 93). Defendants oppose all those motions. ECF Nos. 73, 83, 99.

Because Plaintiffs have shown the putative class members are similarly situated, Plaintiffs' Motion to Certify Collective Action (ECF No. 77) is GRANTED.

Because Plaintiffs failed to show extraordinary circumstances precluded the putative class members from filing their own timely lawsuits, Plaintiffs' Motion for Equitable Tolling (ECF No. 93) is DENIED.

Because Defendants failed to comply with the Court's Discovery Order (ECF No. 58), Plaintiffs' Motion to Compel (ECF No. 68) is GRANTED, but their Motion for Attorney's Fees (ECF No. 68) is DENIED.

## I.   Background

Plaintiffs filed this putative collection action under 29 U.S.C. § 216(b) for violations of the Fair Labor Standards Act ("FLSA"), on behalf of themselves and other similarly situated employees ("Putative Class Members") of D'Argent Franchising, L.L.C., D'Argent Construction, L.L.C., and D'Argent Companies, L.L.C. (formerly D'Argent Development, L.L.C.). The named Defendants are D'Argent Franchising, L.L.C., D'Argent Construction, L.L.C., and D'Argent Companies, L.L.C. (collectively "D'Argent"), as well as Thomas Giallonardo III and Justin Giallonardo ("Justin"). ECF No. 1.

Williams ("Williams) worked for D'Argent Franchising and is a member of the proposed class. ECF No. 1 at 1. Fisher worked for D'Argent Construction and is a member of the proposed class. ECF No. 1 at 2. Pigott worked for D'Argent Franchising and is not a member of the proposed class. ECF No. 1 at 2.

Plaintiffs allege D'Argent operated as an integrated enterprise known as "D'Argent Companies," consisting of D'Argent Franchising, D'Argent Construction, and D'Argent Companies. ECF No. 1 at 2-3.

Fisher and Williams assert that Thomas and Justin each are a manager, officer, director, and part owner of the D'Argent Companies. ECF No. 1 at 2-3.

They contend Thomas and Justin exercise operational control over significant aspects of Defendants' day-to-day functions. ECF No. 1 at 2-3. Plaintiffs allege Thomas and Justin each are individually liable for any violation of the FLSA, and that they are "employer[s]" under the FLSA, 28 U.S.C. § 203(d). ECF No. 1 at 2-3.

Plaintiffs contend the D'Argent businesses have a common policy and practice of not paying employees for any hours worked over 40 hours in one week. ECF No. 1 at 4, 11. Plaintiffs claim D'Argent deleted hours worked over 40 per week at D'Argent Franchising's two franchises: Huddle House and CC's Coffee House. ECF No. 1 at 4, 11. Fisher claims to have routinely worked more than 40 hours per week at D'Argent Construction without being paid overtime. ECF No. 1 at 5.

Defendants answered the Complaint (ECF No. 4). Then subsequently filed counterclaims against Wesley Pigott, alleging that, as manager of D'Argent Franchising's Huddle House, he engaged in payroll fraud, theft, and sexual harassment of employees. ECF No. 54. Defendants seek monetary damages.

The parties jointly filed and the Court adopted a proposed scheduling order, which included specified preliminary discovery. ECF No. 58. Plaintiffs subsequently filed a Motion to Compel discovery in accordance with the Court's order and a Motion for Attorney Fees. ECF No. 68.

Plaintiffs also filed a Motion to Certify Collective Action, and Motion for Equitable Tolling of Putative Class Members' FLSA Claims. ECF Nos. 77, 93. Defendants oppose those motions. ECF Nos. 83, 99.

## II.   Law and Analysis

### A.   Plaintiffs' Motion to Certify Collective Action is GRANTED.

#### 1.   The Law as to FLSA Collective Actions

"Congress enacted the FLSA to eliminate both 'substandard wages' and 'oppressive working hours.'" *Helix Energy Solutions Group, Inc. v. Hewitt*, 143 S. Ct. 677, 682 (U.S. 2023) (*citing Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 739 (1981)). "The statute addresses the former concern by guaranteeing a minimum wage." *Helix Energy Solutions Group, Inc.*, 143 S. Ct. at 682 (*citing* 29 U.S.C. § 206). "It addresses the latter by requiring time-and-a-half pay for work over 40 hours a week—even for workers whose regular compensation far exceeds 'the statutory minimum.'"[1] *Helix Energy Solutions Group, Inc.*, 143 S. Ct. at 682; 29 U.S.C. § 207.

"The overtime provision was designed both to 'compensate [employees] for the burden' of working extra-long hours and to increase overall employment by incentivizing employers to widen their 'distribution of available work.'" *Id.* "Employees therefore are not "'deprived of the benefits of [overtime compensation]

---

[1] The FLSA "requires employers to pay covered employees a minimum wage of $7.25 per hour and overtime wages at a rate of at least one and one-half times the employee's regular rate of pay for hours worked in excess of 40 per workweek. 29 U.S.C. §§ 206(a)(1), 207(a)(1)." *Bancroft v. 217 Bourbon, L.L.C.*, 2022 WL 124025, at *2 (E.D. La. 2022).

simply because they are well paid.'"[2] *Helix Energy Solutions Group, Inc.*, 143 S. Ct. at 682 (*citing Jewell Ridge Coal Corp. v. Mine Workers*, 325 U.S. 161, 167 (1945)).

"If an employer violates the FLSA's minimum wage or overtime provisions, it is liable to the employee for the employee's unpaid minimum wages or unpaid overtime compensation, as well as 'an additional equal amount as liquidated damages.' 29 U.S.C. § 216(b)." *Bancroft*, 2022 WL 124025, at *3. "An employee may sue an employer for violating the minimum wage or overtime compensation provisions of the FLSA either individually or collectively on behalf of himself or herself and 'other employees similarly situated.'"[3] *Bancroft*, 2022 WL 124025, at *3

---

[2] "The FLSA, however, exempts certain categories of workers from its protections, including the overtime-pay guarantee. The statutory exemption relevant here applies to 'any employee employed in a bona fide executive, administrative, or professional capacity ... (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]).' § 213(a)(1). Under that provision, the Secretary sets out a standard for determining when an employee is a 'bona fide executive.' If that standard is met, the employee has no right to overtime wages." *Helix Energy Solutions Group, Inc.*, 143 S. Ct. at 682.

[3] To state a claim for unpaid minimum or overtime wages under the FLSA a plaintiff must plead: '(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's [minimum wage or] overtime wage requirements; and (4) the amount of [minimum wages or] overtime compensation due.'" *Bancroft*, 2022 WL 124025, at *3 (*citing Johnson v. Heckmann Water Res., Inc.*, 758 F.3d 627, 630 (5th Cir. 2014); *see also White v. United States Corrections, L.L.C.*, 996 F.3d 302, 309 (5th Cir. 2021).

Once the employee establishes a *prima facie* case, the burden then shifts to the employer to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Johnson*, 758 F.3d at 630 (*citing Harvill v. Westward Communications, L.L.C.,* 433 F.3d 428, 441 (5th Cir. 2005). If the employer claims "that the suing employee is exempt from the overtime requirement." *Johnson*, 758 F.3d at 630 (*citing* 29 U.S.C. § 216(b)). Then the employer "has the burden of proving that the employee falls within the claimed

(*citing* 29 U.S.C. § 216(b)).  "Unlike a class action under Rule 23 of the Federal Rules of Civil Procedure, which requires putative plaintiffs to opt out, a collective action under § 216(b) benefits and binds only those employees who affirmatively 'opt in' to the suit." *Id.* "No employee shall be a party plaintiff to any such action unless he [or she] gives his [or her] consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Bancroft*, 2022 WL 124025, at *3.[4]

"The plaintiff bears the burden of showing that they and the other prospective plaintiffs are similarly situated." *Swales v. KLLM Transport Services, L.L.C.,* 985 F.3d 430, 435 n. 65 (5th Cir. 2021). "This generally requires an affirmative showing that all of the prospective plaintiffs had substantially similar job requirements and were subject to the same compensation scheme. Factors that might be considered include '(1) the factual and employment settings of the [prospective plaintiffs]; (2) the various defenses available to the defendant and if

---

exempted category." *Johnson*, 758 F.3d at 630 (*citing Samson v. Apollo Restaurant, Inc.,* 242 F.3d 629, 636 (5th Cir. 2001), *cert. den.*, 534 U.S. 825 (2001)).

[4] "Section 216(b) of the FLSA is a catch-all provision titled 'Damages; right of action; attorney's fees and costs; termination of right of action.'" *See Swales v. KLLM Transport Services, L.L.C.,* 985 F.3d 430, 434 (5th Cir. 2021). "The middle of the provision states that employees may proceed collectively when they are 'similarly situated.'" *See Swales*, 985 F.3d at 434–35 (*citing* 29 U.S.C. § 216(b)). "Congress amended the FLSA's collective-action procedure through the 1947 Portal-to-Portal Act, requiring similarly situated employees to opt-in via written consent. *See Swales*, 985 F.3d at 434–35 (*citing Hoffman-LaRoche Inc. v. Sperling,* 493 U.S. 165, 173 (1989)). "The Portal-to-Portal Act takes into account the dual goals of collective actions: (1) enforcement (by preventing violations and letting employees pool resources when seeking relief); and (2) efficiency (by resolving common issues in a single action)." *See Swales,* 985 F.3d at 435 (*citing Bigger v. Facebook, Inc.,* 947 F.3d 1043, 1049 (7th Cir. 2020)).

any defenses are individualized rather than applying to the [prospective plaintiffs] as a whole; and (3) fairness and procedural considerations.'"[5] *Barron v. Sterling Sugars Sales Corporation,* 2022 WL 1571233, at *2 (W.D. La. 2022) (*citing Swales*, 985 F.3d at 435). The FLSA's similarity requirement is something that district courts should rigorously enforce at the outset of the litigation. *Swales*, 985 F.3d at 443.

"The FLSA does not define what it means for employees to be 'similarly situated'; nor has the Fifth Circuit defined the term. Both before and after *Swales*, however, courts have repeatedly stressed that plaintiffs must only be similarly–not identically–situated to proceed collectively." *Boudreaux v. Schlumberger Technology Corporation*, 2022 WL 17422103, at *3 (W.D. La. 2022), *report and recommendation adopted*, 2022 WL 17417265 (W.D. La. 2022), *appeal filed* (5th Cir. 2022) (*citing Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001), cert. den., 534 U.S. 1127 (2002); *Basco v. Wal–Mart Stores, Inc.*, 2004 WL 1497709, at *5 (E.D. La. 2004)).

"[T]he pertinent inquiry is whether the plaintiffs have 'demonstrated similarity among the individual situations.'" *Boudreaux*, 2022 WL 17422103, at *3 (*citing Segovia v. Fuelco Energy, L.L.C.*, 2021 WL 2187956, at *8 (W.D. Tex. 2021)); *see also Spillers v. Louisiana PHS, L.L.C.,* 2022 WL 1675950, at *3–4 (W.D. La. 2022), *report and recommendation adopted*, 2022 WL 1664120 (W.D. La. 2022).

---

[5] The Fifth Circuit expressly rejected the "conditional certification" approach for certifying collective actions in *Swales*. *See In re A&D Interests, Incorporated,* 33 F.4th 254, 256 (5th Cir. 2022).

'They may do that by showing 'some factual nexus which binds' them and opt-in plaintiffs (or potential opt-in members depending on timing of the inquiry) as alleged victims of a particular policy or practice." *Id.* Thus, "hearing the cases together furthers the purposes of [the statute], is fair to both parties, and does not result in an unmanageable trial." *Id.; Vanzzini v. Action Meat Distributors, Inc.*, 995 F. Supp. 2d 703, 720 (S.D. Tex. 2014).

To determine whether a plaintiff has met the burden of showing the putative collective action members are similarly situated, a court will consider three factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Hamm v. Acadia Healthcare Co., Inc.*, 2022 WL 2713532, at *2 (E.D. La. 2022).

"[P]utative class members must show they were affected by a common policy, plan, pattern or practice to meet the similarly situated requirement." *Hamm*, 2022 WL 2713532, at *2 (*citing Loy v. Rehab Synergies, L.L.C.,* 2021 WL 3931926, at *8 (S.D. Tex. 2021)). "The key consideration is that to be similarly situated, there must be substantial allegations that potential members were together the victims of a single decision, policy, or plan." *Hamm*, 2022 WL 2713532, at *2 (internal citation omitted). The fact that members of the putative collective class work in different facilities or have different job titles does not preclude a finding that they are similarly situated. *See Hamm*, 2022 WL 2713532, at *2 (*citing Torres v. Chambers*

8

*Protective Services, Inc.*, 2021 WL 3419705, at *6 (N.D. Tex. 2021)).  In *Torres,* 2021 WL 3419705, at *6, the court reasoned that the differences between employees were separate from the alleged unlawful practice–failure to pay overtime wages–because the differences did not diminish the plaintiff's evidence of the alleged unlawful practice.  Similarly, in *Loy*, 2021 WL 3931926, at *11, the court found the differences in the collective action members' job titles, managers, work facilities, schedules, and productivity requirements were not material to the fact that they were similarly situated because they were all subjected to a uniform policy of unrecorded overtime.

In *Field v. Anadarko Petroleum Corp.,* 2020 WL 6075633, at *3 (S.D. Tex. 2020), the plaintiff alleged under-compensation for overtime and misclassification of employees as independent contractors.  Anadarko argued that a "decentralized compensation scheme" for paying the class members meant that no common policy could be identified.  The court found that, although several staffing companies were involved, "[a]ll that matters . . . is that Field has sufficient pleaded that he and similarly situated class members were the victims of a single pay policy: a failure to pay overtime to those classified as independent contractors and paid a day-rate."  *See also Mendoza v. Baird Drywall & Accoustic, Inc.,* 2021 WL 2435873, at *4 (W.D. Va. 2021) (finding that, despite its use of several labor-brokers, defendant's pay and worker control practices are the same at all job sites).

9

Thus, in deciding whether to send notice of an FLSA collective action, a district court must rigorously scrutinize the definition of similarly situated workers at an early stage of the litigation.[6] *See Barron*, 2022 WL 1571233, at *2. A court should:

(1) Identify what facts and legal considerations will be material to determining whether a group of "employees" is "similarly situated";

(2) Authorize preliminary discovery as early as possible to determine if and when to send notice to potential opt-in plaintiffs;

---

[6] "Because similarly situated employees may opt-in to an FLSA collective action by filing written consent and 'an employee cannot benefit from a collective action without accurate and timely notice,' the trial court plays an important notice-giving role." *Barron,* 2022 WL 1571233, at *2 (*citing Swales,* 985 F.3d at 435). "Notice to potential plaintiffs is proper if the available evidence establishes that the plaintiff has met the 'similarly situated' threshold." *Barron,* 2022 WL 1571233, at *2 (*citing Swales,* 985 F.3d at 442). "A trial court must oversee the notice process without giving even the appearance of judicial endorsement of the merits of the action." *Barron,* 2022 WL 1571233, at *2 (*citing Swales,* 985 F.3d at 436). "District courts have 'broad, litigation-management discretion' and must 'consider all of the available evidence' in determining whether and to whom notice should be issued." *Barron,* 2022 WL 1571233, at *2 (*citing Swales,* 985 F.3d at 442).

"A district court's focus should be on whether those receiving notice will be able to 'ultimately participate in the collective [action].'" *In re A&D Interests, Inc.*, 33 F.4th at 259 (*citing Swales*, 985 F.3d at 441; *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 502 (2016)). Issuing notice to those who will not *ultimately* be able to participate "'merely stirs up litigation,' which is what *Hoffmann-La Roche* flatly proscribes. *See In re A&D Interests, Inc.*, 33 F.4th at 259 (*citing Hoffmann-La Roche Inc.*, 493 U.S. at 170).

If the court finds that the opt-ins are not sufficiently similar to the named plaintiffs, it "must dismiss the opt-in employees, leaving only the named plaintiff's original claims." *Swales*, 985 F.3d at 434. Factors considered at this second step include: "(1) [the] disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to [the] defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations." *Swales*, 985 F.3d at 434. "[A] court has the power to modify an FLSA collective action definition on its own." *Dreyer v. Baker Hughes Oilfield Operations, Inc.,* 2008 WL 5204149, at *3 (S.D. Tex. 2008) (*citing Baldridge v. SBC Communications, Inc.*, 404 F.3d 930, 931–32 (5th Cir. 2005)).

(3) Consider, early in the case, whether merits questions can be answered collectively, when considering the scope of a collective and the "similarly situated" analysis;

(4) Consider all of the available evidence when determining whether and to whom notice should be issued.

*See Swales,* 985 F.3d at 435, 442-43; *see also Boudreaux,* 2022 WL 17422103, at *2.

### 2.   Plaintiffs' Arguments and Evidence

Plaintiffs propose defining the class for their collective action as: "All employees who are or were employed by Defendants D'Argent Franchising, LLC, D'Argent Construction, LLC, or D'Argent Companies, LLC at any point from three years prior to the date of filing this complaint up to the present (November 21, 2017 to present), who have worked over 40 hours in at least one workweek from November 21, 2017 to present, and who were subject to the pay practices of D'Argent Franchising, D'Argent Construction, or D'Argent Companies during that time." Thus, Plaintiffs seek to represent one class of persons: those employed by any one of the named Defendants  from November 21, 2017 through the present; who worked over 40 hours per week any week of their employment; and who were not paid for overtime.

Plaintiffs contend the Putative Class Members are all non-exempt employees who worked in excess of 40 hours per week, but were not fully compensated. ECF No. 1 at 11. At the time of filing suit, Plaintiffs estimated there were approximately 30 Putative Class Members. ECF No. 1 at 12. Plaintiffs move for conditional certification for the following class of putative Opt-in Plaintiffs: "All employees who

are or were employed by Defendants D'Argent Franchising, LLC, D'Argent Construction, LLC, or D'Argent Companies, LLC at any point from three years prior to the date of filing this complaint up to the present (November 21, 2017 to present), who have worked over 40 hours in at least one workweek from November 21, 2017 to present, and who were subjected to the pay practices of D'Argent Franchising, D'Argent Construction, or D'Argent Companies, during that time." ECF No. 77 at 6.

Plaintiffs contend the Defendants operate the D'Argent businesses as a single enterprise. Plaintiffs contend all employees who have been denied overtime are "similarly situated" because they have all been subjected to Defendants' unlawful pay practices, which are applicable to all D'Argent businesses.

Plaintiffs also argue that Defendants' classification of some employees as "salaried" or "management" does not deprive them of the right to overtime pay. In support of their claims, Plaintiffs submit the following:

(1) Justin's email informing Wes Pigott that Huddle House does not pay "tip makeup";
(2) Justin's text message stating overtime is not paid at Huddle House (ECF No. 77-2);
(3) Edited employee time sheets from CC Coffee (ECF No. 77-3);
(4) Time sheet edits report for Huddle House (11/2018-11/2020) (ECF No. 77-4);
(5) Plaintiff Fisher's time sheets showing regular pay given for overtime (ECF No. 74-5);
(6) Justin's deposition testimony (ECF No. 77-6);
(7) Fisher's unsworn statement (ECF No. 77-7); and
(8) D'Argent's policy manual (ECF No. 27-8); and
(9) Emails between Justin and human resources advisor Kelly Smith, PHR, of Ross & Yerger, as to revising the D'Argent employee handbook.

a.    <u>**Fisher's Statement**</u>

Dakota Fisher gave an unsworn statement (ECF No. 77-7). He worked for D'Argent Construction from January through March 2020, doing manual labor. He was labeled as an independent contractor for the first four weeks of his employment–then as an employee for the remainder of his employment–although his job duties were the same throughout his employment. Fisher stated that he and his co-workers received construction directives from D'Argent's corporate office, and Justin Giallonardo often explained in person what needed to be done. ECF No. 77-7. Supervisors also performed manual labor, and had to write down employees' hours on paper in the field. ECF No. 77-7.

Employees typically reported at 7 a.m. each morning and worked until 5 p.m. or later each evening. ECF No. 77-7. Fisher stated he routinely worked more than 40 hours per week–sometimes up to 70 hours–hindering his ability to seek a second job, and that he was also subject to a "non-compete agreement." ECF No. 27-4, No. 77-7. Fisher stated that he did not receive any pay for hours worked over 40 in a week. ECF No. 27-4, No. 77-7. D'Argent Construction employed about 15 workers while Fisher worked there. ECF No. 77-7. Fisher usually worked with seven other

workers on-site, and they would discuss D'Argent's pay violations.  ECF No. 77-7.

Fisher stated he was "personally aware" of his co-workers (primarily manual labor)

being treated like he was: they were interchangeably referred to as independent

contractors or employees; their daily duties and work were directed by D'Argent

Construction; and they worked over 40 hours per week without receiving overtime

pay.  ECF No. 27-4, No. 77-7.

### b.   Employee Handbooks

The D'Argent Companies Handbook (ECF No. 77-8) sets forth employment

categories: "Introductory–all new and rehired employees are considered

introductory employees until completing ninety (90) days of employment and

receiving a satisfactory evaluation"; "Temporary–A temporary employee is one who

is retained on a limited basis as needed, and . . . not eligible for company benefits";

"Salaried–A full-time employee is one who works a minimum of forty (40) hours in a

pay period . . . [and] are not allowed overtime compensation."  ECF No. 77-8 at 11-

12.  The handbook also states that overtime will be paid for hourly waged

employees.  ECF No. 77-8 at 19.

c.    Correspondence and time sheets.

Plaintiffs submitted an August 2018 email from Kellye Smith (of Ross and Yerger Insurance of Louisiana, Inc.) advising Justin that overtime may also be owed to salaried employees.  ECF No. 77-9 at 2.  Plaintiffs also submitted a text message from Justin Giallonardo to Plaintiff Pigott stating that overtime is not paid at Huddle House.  ECF No. 77-2.

Further, Plaintiffs submitted computer timesheets for 39 employees at CC's Coffee (that were provided to Plaintiffs by Defendants in discovery).  ECF No. 77-3. Those time sheets show "edits" to start times, end times, and break times, as well as a few "shift deleted."  The edits were done by named managers and employees, but most often simply by "D'Argent Franchising."  ECF No. 77-3.  The reasons given for the edits, if any, are mostly "forgot to clock in," "forgot to clock out," or "breaks." ECF No. 77-3.  Plaintiffs submitted 89 pages of computer timesheets for employees of Huddle House.[7]  ECF No. 77-4.  Those time sheets show edits to dates and times by managers John Stanford, Wesley Pigott, Richard Molina, "Shift Lead," and "Captain Huddle."[8]  ECF No. 77-4.

---

[7] Justin testified in his deposition that Plaintiffs' counsel was provided with "raw files" that were organized and sent from the Aloha system.  ECF No 77-6 at 52.

[8] Justin testified in his deposition that "Captain Huddle" was a log-in used jointly by Molina and Pigott.  ECF No. 77-6 at 52.

### d.   Pigott's statement

With their initial motion for certification and equitable tolling (ECF No. 27), Plaintiffs also submitted the unsworn statements of Pigott and Molina, two former managers of Huddle House and CC's Coffee.  Pigott stated he was instructed by Justin Giallonardo to "delete any employee hours over forty hours per week," using the edit function.  ECF No. 27-6.  Pigott stated that he deleted employee hours that were over 40 per week for about one month, then refused to continue doing so.  ECF No. 27-6.  Justin Giallonardo retaliated by deducting about $8,000 from Pigott's paychecks – the amount of overtime that Pigott did not delete.  Pigott further stated that he was ordered by Justin to alter the pay records to make everyone part-time except managers, because an employee had filed an EEOC complaint.  ECF NO. 27-6.  Justin attempted at that time to separate the companies.  ECF No. 27-6.  Instead of using a D'Argent Companies Sam's Club card for the franchise restaurants, Justin began using a Sam's Club card issued to D'Argent Franchising.[9]

### e.   Molina's statement

Molina states that Justin used Molina's log-in credentials in the Heartland software to deduct money from Pigott's paycheck because Pigott had paid overtime

---

[9] Pigott also stated that, after Plaintiff Williams turned down Justin's attempt to have sex with her, he told Pigott to fire Williams.  ECF No. 27-6.  Pigott told Williams she was going to be fired and suggested that she resign instead.  ECF No. 27-6.  When Williams resigned, Pigott and the manager wrote her separate paperwork to show she had resigned.  ECF No. 27-6.  However, Justin overrode that and ordered the manager to rewrite the paperwork as a "termination for cause."  ECF No. 27-6.  Pigott described Justin's inappropriate behavior towards several of the female employees.  ECF No. 27-6.

to employees.  ECF No. 27-2.  Justin told Molina that Pigott was not supposed to pay overtime.  ECF No. 27-2.  Molina also states that, to comply with D'Argent's no overtime policy at CC's, he deleted any work hours over 40 per week in the Brinks Point of Sale system, then entered 40 hours in the Heartland system.  ECF No. 27-2.  When an employee reached 40 hours in a week, he would tell them not to clock-in anymore that week.  ECF No. 27-2.  The employee would continue to work, but would not be paid for the additional hours.  ECF No. 27-2.  However, Molina occasionally paid employees' overtime to prevent them from quitting.  ECF No. 27-2.  Molina would have an argument with Justin about the overtime, but he would allow it occasionally as an exception to the general policy.  ECF No. 27-2.  Justin directed Molina to change every non-managerial employee's classification to "part-time" in the pay system.  ECF No. 27-2.  In 2020, Justin told Molina that he had to take steps, such as "substantial adjustments" to Huddle House, to make D'Argent Franchising look separate from the other D'Argent companies.  ECF No. 27-2.

### f.  Williams' statement

Williams stated in an unsworn statement that she saw D'Argent payroll records, observed that the franchise employees were not being paid for over 40 hours per week, and heard Just Giallonardo direct the franchise managers to not pay overtime.  ECF No. 27-3.  Williams understood the D'Argent policy was to not pay employees anything at all for hours worked over 40 per week.  ECF No. 27-3.

### g.   Justin Giallonardo's deposition

Plaintiffs also submitted the deposition of Justin Giallonardo ("Justin").[10] ECF NO. 77-6. In his deposition, Justin testified that he is the President of Real Estate for D'Argent Companies, L.L.C. ECF No. 77-6 at 4. Justin testified that D'Argent Companies has never been the owner of D'Argent Franchising or D'Argent Construction. ECF No. 77-6 at 4. Thomas Giallonardo III owns 80% of D'Argent Companies, and Justin and Thomas Giallonardo IV each own 10%. ECF No. 77-6 at 4. Thomas Giallonardo III owns 100% of D'Argent Franchising. ECF No. 77-6 at 4. Thomas Giallonardo owns 80% of D'Argent Construction, and Thomas Giallonardo IV and Justin each own 10%. ECF No. 77-6 at 4. All three companies have offices in the same building at 1460 Center Court in Alexandria, Louisiana. ECF No. 77-6 at 4. They occupy eight to ten offices in the building. ECF No. 77-6 at 4. D

Justin testified that D'Argent Companies employs two administrative assistants, Kerry McGettigan and Zain Abd, who work for Justin in the real estate division, and for the D'Argent Companies' Operations Coordinator, Joe Rachal. ECF No. 77-6 at 5. Joe Rachal maintains D'Argent Companies' buildings and collects rent. ECF No. 77-6 at 6-7. Justin Giallonardo and Everett Aucoin also work for D'Argent Companies. ECF No. 77-6 at 14. All of these employees work at 1460 Center Court. ECF No. 77-6 at 14.

---

[10] Defendants submitted a partial and uncertified deposition for Justin Giallonardo.  ECF No. 83-12.

There is one accounting professional, Matthew Probst, who works at 1460 Center Court for all three companies as both the Chief Financial Officer and the Human Resources Officer. ECF No. 77-6 at 5. Probst maintained the employee records for all three companies at 1460 Center Court. ECF No. 77-6 at 14. Probst and Justin provided the personnel filed, employee handbooks, payroll records, time-punch records, and other documents to Plaintiffs in discovery. ECF No. 77-6 at 14. Probst is also the office manager at 1460 Center Court. ECF No. 77-6 at 20. The accountant/HR person has always also been the officer manager. ECF No. 77-6 at 20. Before Probst, that person in that job was Brittany Gilcrease, then Bonita Smith, then Susan Kelly. ECF No. 77-6 at 20.

Justin further testified that Everett Aucoin is the Maintenance Tech for D'Argent Companies. He has an office at 1460 Center Court, and he works at all of the properties owned by all of the companies. ECF No. 77-6 at 5-6. Aucoin does things like cut grass and repair roofs. ECF No. 77-6 at 6. Rachal makes monthly site visits to the properties and inspects them for defects and issues, then makes a list and gives it to Aucoin to fix. ECF No. 77-6 at 7. Aucoin is paid by D'Argent Companies because he takes case of properties owned by D'Argent Companies. ECF No. 77-6 at 6. If Aucoin needs assistance with a task, D'Argent Companies employs "Labor Finders of Alexandria" to hire someone to assist him. ECF No. 77-6 at 4.

19

Additional D'Argent Construction employees working at 1460 Center Court include Tommy Giallonardo IV (President of Construction and manager since 2012) and Jamie Ross (project manager). ECF No. 77-6 at 7.

Justin testified that the only companies at 1460 Center Court are D'Argent Companies and D'Argent Construction. ECF No. 77-6 at 21-22.

Justin testified that he has been the manager of D'Argent Franchising since October 2017, when the company started. ECF No. 77-6 at 7. Justin explained he was "the owner's representative," and his role was "to manage the managers" on a day to day basis. ECF No. 77-6 at 9-10. At the time of Justin's deposition, D'Argent Franchising had only one property–CC's Coffee. ECF No. 77-6 at 8.

The Huddle House franchise (not the property) was listed by Davidson Business Investments and represented to have a gross revenue of $1,000,000. ECF No. 77-6 at 50. Justin testified that he did not provide that revenue number, and that Davidson had put it in the advertisement. ECF No. 77-6 at 50. Huddle House was sold for $1, in October 2021, to Gregg Hansen. ECF No. 77-6 at 7-8. Justin said Huddle House was costing him his peace of mind, so he essentially "gave it away," with the lawsuits and liabilities connected to it. ECF No. 77-6 at 8. However, Justin later stated that he "wasn't running Huddle House"–"[t]he manager was running [it]," and that "[he] didn't own the Huddle House"–"Thomas Giallonardo III owned the Huddle House." ECF No. 77-6 at 26. Justin admitted he did not provide the January 3, 2020 Anti-Spoliation letter he had received from

opposing counsel, in connection with the Huddle House lawsuits, to Hansen. ECF No. 77-6 at 8. Justin did not recall seeing: the November 12, 2020 demand letter from Williams' counsel for unpaid wages; the November 23, 2020 preservation request letter to Hospitality Control Solutions relating to D'Argent Franchising and Aloha Data; or the November 23, 2020 preservation request letter to the NCR Corporation. ECF No. 77-6 at 8-9.

From 2018 to March 2022, CC's Coffee had between 10 to 15 employees at a time. ECF No. 77-6 at 10. At CC's there was a manager and a barista. ECF No. 77-6 at 11. From 2018 to October 2021, Huddle House had 15 to 20 employees at a time. ECF No. 77-6 at 10. At Huddle House, the employees consisted of managers, servers, and cooks. ECF No. 77-6 at 10. There were no assistant managers at either business. ECF No. 77-6 at 10-11. From any location, including 1460 Center Court, Justin was able to speak to the managers, look at the businesses' profit and loss statements, and view the through their security cameras. ECF No. 77-6 at 10. He was also able to view the employee files through the internet. ECF No. 77-6 at 11.

D'Argent Construction has five to 10 employees, who are either supervisors or common laborers. ECF No. 77-6 at 25.

As of March 2021, Probst had maintained the employee files for about a year. ECF No. 77-6 at 11. Before that Susan Kelly maintained them for about 8 months, and Brittany Gilcrease did so for about 2 years before Kelly. ECF No. 77-6 at 11.

Probst, Kelly, and Gilcrease all had the same accounting and HR functions.  ECF No. 77-6 at 11.  They were also the officer manager for 1460 Center Court.  ECF No. 77-6 at 20.  They handled the human resources department for all of the D'Argent companies.  ECF No. 77-6 at 21.  Justin further testified that, when he was working in human resources for the companies, he hired and fired employees jointly with Thomas Giallonardo IV.  ECF No. 77-6 at 21.

Brittany Gilcrease handled the payroll for D'Argent Franchising while she was the HR and accounting person employed by D'Argent Construction, L.L.C.

Deposits from the companies and employee/HR paperwork were left daily with the D'Argent Companies receptionist, who delivered them to Matthew Probst.  ECF No. 77-6 at 34.  Justin testified there had been several receptionists, and that Kristen Baxley was one.  ECF No. 77-6 at 34.

Justin testified that D'Argent Companies had been around since about 2000, and that it has its own bank account.  ECF No. 77-6 at 11.  D'Argent Franchising also has its own bank account–a combined account for both CC's and Huddle House.  ECF No. 77-6 at 11.  D'Argent Construction also has its own account.  ECF No. 77-6 at 12.  The profits earned by D'Argent Franchising and D'Argent Construction are not distributed to the members or funneled into D'Argent Companies.  ECF No. 77-6 at 12.  They simply stay in the company accounts.  ECF No. 77-6 at 12.

However, Justin testified that, in 2020, D'Argent Companies "was the overall for everything" and issued the employee handbook for all of the companies.  ECF

No. 77-6 at 35.  Justin also testified that there are four employee handbooks–one for D'Argent Companies, one for D'Argent Construction, one for CC's and one for Huddle House.  ECF No. 77-6 at 17.  The handbooks were reviewed annually for necessary updates.  ECF No. 77-6 at 16-17.  The Huddle House handbook was for all employees, regardless of how they were paid.  ECF No. 77-6 at 21.

D'Argent Franchising had sales in excess of $500,000 per year while it had Huddle House.  ECF No. 77-6 at 12.  Justin did not know the dollar amount of the annual sales for D'Argent Construction or D'Argent Companies.  ECF No. 77-6 at 12.  Also, D'Argent Franchising, D'Argent Construction and D'Argent Real Estate do not own any real estate investment properties.  ECF No. 77-6 at 12-13.  D'Argent Companies owns all of the real estate investment properties.  ECF No. 77-6 at 12. Justin explained that D'Argent Construction only does work for third parties.  ECF No. 77-6 at 12.  D'Argent Franchising but operates its franchises out of real property owned by D'Argent Companies, and pays rent.  ECF No. 77-6 at 13.  If there is work that needs to be done on D'Argent Companies properties that is a large project, over $25,000, then D'Argent Construction is employed for that type of project.  ECF No. 77-6 at 13.  Smaller jobs are handled by D'Argent Companies employees Joe Rachal and Everett Aucoin.  ECF No. 77-6 at 13.

Justin further testified that D'Argent Companies has the authority to hire or fire Rachal and Aucoin.  ECF No. 77-6 at 13.  Thomas Giallonardo IV has the authority to hire or fire employees at D'Argent Construction.  ECF No. 77-6 at 13.

However, only the managers at CC's and Huddle House had the authority to hire and fire employees—Justin did not have that authority.  ECF No. 77-6 at 13-14.  And only Thomas Giallonardo III and the accountant had signing authority on the accounts for D'Argent Franchising.  ECF No. 77-6 at 46.

Marketing for all three companies is handled by Ugly Mug Marketing.  ECF No. 77-6 at 16.

Justin explained that Dakota Fisher did not receive any overtime pay for the overtime he worked because he stole tires and a cell phone from D'Argent Construction when he left his employment.  ECF No. 77-6 at 22.  Justin said Fisher was not given overtime pay because he was not honest.  ECT No. 77-6 at 23.  Justin also testified that Fisher was an "independent contractor" who signed an independent contractor agreement (including a noncompete clause), but was not sure why he was different from a regular employee.  ECF No. 77-6 at 36.

Justin testified that D'Argent Companies does not contract with any independent contractors.  ECF No. 77-6 at 36.  One of the accountants would be able to state how many independent contractors D'Argent Construction contracts with.  ECF No. 77-6 at 36.

Justin testified that everyone at D'Argent Construction who worked overtime was paid overtime.  EF No. 77-6 at 23.  Justin could not explain why the payroll records for D'Argent Construction, showing overtime was paid, were not provided.  ECF No. 77-6 at 23-24.  Although the Magistrate Judge ordered that preliminary

24

discovery include pay and payroll structure (ECF No. 58), Defendants contend they withheld the pay records for D'Argent Construction because they were not part of the limited discovery ordered by the Court. ECF No. 68; No. 77-6 at 24.

Justin also explained that, when Wes Pigott was managing Huddle House, Justin told him often (and emailed him) to manage his labor schedule to eliminate overtime and keep labor costs no higher than 20 percent. ECF No. 77-6 at 27. Justin said Wes Pigott paid too much overtime to the employees, but he never told him to erase the overtime. ECF No. 77-6 at 27-29. Justin also testified that Pigott was paid a salary of $65,000 per year, so he did not receive overtime pay despite regularly working 36 hours per week of overtime. ECF No. 77-6 at 32. Pigott had a reduction in pay from March 6 to March 20, 2020, which Justin testified was probably due to "insubordination," but that he might not have written Pigott up. ECF No. 77-6 at 33, 47. Pigott had two subsequent pay reductions within four months, but Justin did not remember why. ECF No. 77-6 at 33, 47.

Molina managed both CC's and Huddle House for about three weeks. ECF No. 77-6 at 28. Justin authorized overtime for servers at Huddle House when it was short-staffed. ECF No. 77-6 at 31.

Justin further testified that "punches" are edits in the payroll system. ECF No. 77-6 at 31. Justin initially believed there were punches due to employees forgetting to clock in and out. ECF No. 77-6 at 32. But Justin said he now believes Wes Pigott was editing the Huddle House payroll system in order to "take

advantage of my business" for the benefit of employees (his children and his girlfriend). ECF No. 77-6 at 32. Justin testified that Pigott was keeping Williams clocked in all the time and, whenever he saw the labor percentage at the end of the week was high or low, he would add to or take away from Williams's hours. ECF No. 77-6 at 52. Justin believed Piggott was doing the same thing for his other family and friends–Tony Hunter, Cody Hunter, and Mia Piggott. ECF No. 77-6 at 53.

Justin testified he could see when too many people were still clocked in by looking at the labor percentage in huddlehouse.net. ECF No. 77-6 at 53. If the labor percentage was 50, he knew something was wrong. ECF No. 77-6 at 53. And he knew who was clocked because there were "sorted by hours, by servers and cooks." ECF No. 77-6 at 53.

Justin testified that the employee payroll report for CC's can be provided by the Brinks system. ECF No. 77-6 at 54. When asked why it had not already been provided, Justin state he did not know. ECF No. 77-6 at 54. Defense counsel said she had "no idea" whether it had been provided and would check on it. ECF No. 77-6 at 54.

Justin offered a bonus incentive to the managers (Pigott and Molina) for profits. ECF No. 77-1 at 53. That incentive was why Pigott and Molina would delete hours from the payroll records of employees. 77-6 at 53. However, neither Piggott nor Molina ever received the bonus because they never had a high enough

profit.  Justin testified that, although he had the ability to edit the payroll records, he did not do it.  77-6 at 53.

In any event, since employees were not clocking out, Justin asked Pigott to make sure they did so he could determine profit and loss.  ECF No. 77-6 at 44.  When they did not clock out, Pigott had to talk to the employee, they would agree on the time, and Pigott would change the payroll report.  No. 77-6 at 44.  In 2020, Justin finally told Pigott to tell the employees they would be "penalized" if they did not clock in and out properly.  No. 77-6 at 44.  Although he did not have a specific penalty in mind, Justin said they probably would have been written up.  No. 77-6 at 44.  Justin told Pigott to put a daily punch audit report with the daily deposit.  ECF No. 77-6 at 46.

Justin claims Pigott had Plaintiff Williams helping him with his managerial work even though she was a server, and that is why she said she had "managerial duties."  Williams resigned or was terminated from Huddle House.  ECF No. 77-6 at 47.  Justin claimed that Pigott filed the paperwork as "terminated" so Williams could draw unemployment.  ECF No. 77-6 at 48.  Pigott was subsequently terminated in September 2020.  77-6 at 47.

Molina started as a cook at Huddle House.  ECF No. 77-6 at 54.  Then he went to CC's Coffee as the manager.  ECF No. 77-6 at 54.  Then he became manager of both CC's and Huddle House.  ECF No. 77-6 at 54.  Molina was then paid $52,920 by D'Argent Franchising.  ECF No. 77-6 at 54.

Justin testified that it appeared that Williams was paid a straight hourly wage, but that it was done by Wes Pigott and not by Justin.  ECF No. 77-6 at 37. Justin reiterated that Pigott had stolen over $10,000 from him.  ECF No. 77-6 at 37. Justin asserted that Pigott taught Molina how to manipulate the payroll records and that Molina's girlfriend was also paid a flat rate.  ECF No. 77-6 at 37.  Pigott allegedly paid his son, Doodie Pigott (a high school student), a Huddle House cook's salary although he did not actually work there.  ECF No. 77-6 at 38-39.  However, Justin admitted that Doodie Pigott drove him around a couple of times and sometimes washed his cars, for which Justin paid him in cash.  ECF No. 77-6 at 39, 42.  Pigott also employed about three work-release employees at Huddle House. ECF No. 77-6 at 39.  Cody Hunter was paid $10 per hour for 80 hours every two weeks.  ECF No. 77-6 at 39.  Tony Hunter complained that his pay was always wrong, that he was told to bring the issue up with Justin, and that Justin always told him he would "look into it" but never did.  ECF No. 77-6 at 39.  Justin testified that Tony Hunter did not even work those weeks because the Detention Center was closed due to COVID.  ECF No. 77-6 at 52.

On reviewing Williams's pay record, Justin testified that, although it looked like Williams was only paid $2.13 per hour, she was actually paid at least minimum wage, and that Pigott controlled her pay.  ECF No. 77-6 at 50.

CC's and Huddle House employee complaints went to the managers, unless the employee complained "to corporate."  Justin testified that he might not have

28

written Pigott up.  ECF No. 77-6 at 43.  Then the corporate representative would get in touch with Justin because he was the owner's representative.  ECF No. 77-6 at 41.  The corporate representative for Huddle House was Marty Donoboski.  ECF No. 77-6 at 43.  Donoboski was later replaced by Gregg Hansen.  ECF No. 77-6 at 46.

When asked why names were redacted from the D'Argent Construction employee records provided to Plaintiffs, Justin testified the redactions appeared to have been done by Susan Kelly because it was her handwriting.  ECF No. 77-6 at 49.  When defense counsel stated the redaction were done from her office, Justin argued they had been done by Susan Kelly (D'Argent's HR employee).  ECF No. 77-6 at 49.  Justin said Kelly was just trying to protect them.  ECF No. 77-6 at 49.

Justin testified that D'Argent "rebranded" in about 2020 and created a new website which did not include Huddle House.  ECF No. 77-6 at 50.

### 3.  Defendants' arguments and evidence.

Defendants argue that their businesses constitute three separate entities and are not a single enterprise.  Defendants contend this is shown by the facts that each business: (1) has its own timekeeping system, payroll provider, management structure and managers; (2) has its own location, schedule, handbook, job titles, job descriptions, employment policies; and (3) performs entirely different business services, with entirely different job duties and worker schedules.   Defendants

contend the companies had "completely separate operations" in "totally separate industries." ECF No. 83 at 13.

Defendants also argue that the proposed class of employees are not similarly situated because they do not have the same jobs, some are "salaried-exempt," and some are "coded," or listed, "salaried non-exempt."[11]

Defendants have also made allegations and statements that could be fairly considered as "personal attacks" on Plaintiffs. Because those arguments and statements are irrelevant, they are not considered.

Defendants further contend D'Argent Franchising owns and runs a CC's Coffeehouse franchise and a Huddle House franchise. ECF No. 83 at 9. The timekeeping, scheduling, and pay are managed by the on-site managers of each franchise. ECF NO. 83 at 10. Huddle House uses employee timekeeping software called "Aloha," while CC's Coffee uses software called "Partech/Brinks." Payroll for D'Argent Franchising employees was processed through a third-party payroll vendor, Heartland, through November 2020, and after that, by Paychex. D'Argent Franchising had an employee handbook with timekeeping policies that prohibited employees from working "off the clock," and stated that overtime pay was "awarded"

---

[11] Defendants contend that Fisher worked for D'Argent Construction through March 2020, and was never "coded" as a salaried, non-exempt employee. Defendants contend that Williams worked for D'Argent Franchising through August 2020 and was never coded as a salaried, non-exempt employee. Defendants contend that Pigott worked for D'Argent Franchising through September 2020. ECF No. 83 at 12-13.

to all non-exempt hourly workers who worked over 40 hours in a week.  ECF No. 83 at 10.

Defendants argue that D'Argent Companies did not have any employees during the "relevant time period," and did not hire anyone until January 2021. ECF No. 83 at 11.  However, Defendants admit that "[s]ometimes in company documents, the branding of 'D'Argent Companies' is used to refer to both the real estate and construction sides of D'Argent Construction."  ECF No. 83 at 11. D'Argent Companies "was used as a trade name for D'Argent Construction."  ECF No. 83 at 12.  But Defendants contend that "everyone who works in real estate or construction, or both, is an employee of D'Argent Construction."  ECF No. 83 at 11.

D'Argent Construction is managed by Justin Giallonardo, Thomas Giallonardo III, and Thomas Giallonardo IV.  ECF No. 83 at 11.  Defendants allege in their briefs that, at D'Argent Construction, hourly "non-exempt" employees kept time on paper time sheets that their supervisors would enter into field report software.  Payroll was processed by the same software.  Salaried "exempt" employees did not clock in or out.

Defendants also admit that employment policies for D'Argent Construction were in a D'Argent Companies employee handbook, including timekeeping policies. ECF No. 83 at 11.  The timekeeping policies state that "even unapproved overtime 'must be paid.'" ECF No. 83 at 12.  However salaried "exempt" employees do not receive overtime pay, pursuant to policy.  ECF No. 83 at 12.

31

Defendants claim that, after D'Argent Companies hired employees, its payroll was administered through QuickBooks. D'Argent Companies' employee handbook states that "[e]xempt salaried employees will not be paid on an overtime basis and may be asked to work extra hours as business demands." ECF No. 83 at 12. The handbook also states that non-exempt employees will be paid overtime for hours worked beyond 40 hours in a workweek. ECF No. 83 at 12.

Defendants also argue their counterclaims against Pigott, alleging fraud and wrongdoing. ECF No. 83 at 14-17. These claims and arguments are irrelevant to class certification and denial of overtime pay.[12]

In support, Defendants submitted:

(1) Seven unsworn and anonymous statements from anonymous individuals (names and signatures redacted) (ECF Nos. 83-1, 3, 4, 5, 6, 7, 8);

(2) Unsworn declaration by Defendant Justin (ECF No. 83-2);

(3) Unsworn declaration by defense attorney Susan Fahey Desmond with attached documents (ECF No. 83-9);

(4) An unidentifiable and uncertified page with "overtime policy";

(5) Uncertified excerpt from Plaintiff Williams' deposition (ECF No. 83-11); and

(6) Uncertified excerpt from Defendant Justin's deposition (ECF No. 83-12).

---

[12] Although Defendants contend that both Molina and Pigott "manipulated hours in the timekeeping system without authorization and stole money from employee's paychecks," (ECF No. 83 at 15), they do not allege any specific facts to show Pigott and Molina manipulated the timesheets to remove hours from any employees. They only allege that Pigott and Molina overpaid their girlfriends, Williams and Taylor Smith. ECF No. 83 15 14-15.

### a.   Unsworn anonymous statements

Defendants' anonymous unsworn statements will not be considered. Unsworn statements must be signed to have the force and effect of a sworn statement. *See* 18 U.S.C. § 1746.[13] "When under any federal regulation a matter is required to be sworn to in writing, it may be supported by an unsworn, signed writing declaring the matter to be 'true under penalty of perjury,' in a form substantially similar to 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).'" *Clark v. Wright National Flood Insurance Co.*, 821 Fed. Appx. 342, 345–46 (5th Cir. 2020) (*citing* 28 U.S.C. § 1746).

The lack of a signatory for a declaration prevents any person or entity from being held to the statements within under penalty of perjury. An unsworn and unsigned statement does not meet the requirements of § 1746. *See McGehee v. Nebraska Department of Correctional Services*, 2019 WL 266423, at *4–5 (D. Neb. 2019); *see also Pickens v. Harris County,* 2006 WL 3175079, at *2 (S.D. Tex. 2006) (sustaining objection to a proffered unsigned statement of a witness) *(citing Okeye v. University of Texas Houston Health Sciences Center,* 245 F.3d 507, 515 (5th Cir. 2001) (an unsigned statement "is not competent summary judgment evidence

---

[13] Similarly, affidavits must be signed. *See Flemming v. Corrections Corporation of America,* 143 Fed. Appx. 921, 925 n. 1 (10th Cir. 2005) ("[a]n unsigned affidavit ... does not constitute evidence under Fed. R. Civ. P. 56(e)"); *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir. 1990) ("[A]n 'unsigned affidavit' is a contradiction in terms.").

because it does not comply with the requirements of Federal Rule of Civil Procedure 56(e)"), and *Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir. 1988) (an unsworn affidavit was "disregarded as summary judgment proof" because it allowed "the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods")).

"[B]ecause the competence (or even the existence) of unidentified individuals is impossible to determine, statements of anonymous persons—so-called anonymous affidavits—cannot be considered as evidence to support a motion. For adjudicatory proceedings, *in camera* filings and requests for protective orders are available in appropriate circumstances to protect the legitimate interests of a party or other person." *See Deukmejian v. Nuclear Regulatory Commission*, 751 F.2d 1287, 1321 n. 203 (D.C. Cir. 1984), *opinion vacated on other grounds oh reh'g, sub nom. San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Commission*, 789 F.2d 26 (D.C. Cir. 1986), *cert. den.*, 479 U.S. 923 (1986).

In *Doe v. Los Angeles Unified School District*, 2017 WL 797152, at *9 (C.D. Cal. 2017), the court noted that "[i]n rare circumstances, witnesses may testify anonymously; however, 'absent extraordinary circumstances, witnesses do not testify anonymously under our system of laws'" (*quoting Diamond Pleasanton Enterprise, Inc. v. City of Pleasanton,* 2015 WL 74946, at *1 (N.D. Cal. Jan. 5, 2015)).[14]  In *Doe*, the plaintiff introduced anonymous declarations but did not seek a

---

[14] Anonymity may also be accomplished by use of a pseudonym, which is similarly disfavored by courts. "Proceeding under a pseudonym in federal court is, by all accounts,

protective order to keep juvenile witness names under seal, nor did the plaintiff file any document identifying the signatories to supporting declarations. *Id.* The court concluded that the declarations did not meet the requirements of § 1746 because "[w]ithout any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under 'penalty of perjury.'" *Id.* The court further reasoned that it could not discern whether the declarations were signed by any witness because the signature block was redacted. *Id.*

The court's reasoning in *Doe* is applicable to the anonymous (redacted) unsworn statements submitted by Defendants. Defendants did not file any documents identifying the declarants and a protective order was not sought. Without identification of the declarants, they cannot be held to their statements under "penalty of perjury." Because no reason for the declarants' anonymity is provided, there is no basis for admission of their statements.[15]

    **b.**   <u>Pay statements</u>

---

'an unusual procedure.'" *Femedeer v. Haun,* 227 F.3d 1244, 1246 (10th Cir. 2000) (quoting *M.M. v. Zavaras,* 139 F.3d 798, 800 (10th Cir. 1998)). "The use of fictitious names is disfavored, and the judge has an independent duty to determine whether exceptional circumstances justify such a departure from the normal method of proceeding in federal courts." *Doe v. Blue Cross & Blue Shield United of Wisconsin,* 112 F.3d 869, 872 (7th Cir. 1997).

[15] Defendants and their attorneys have attempted to impugn the credibility of two of their former supervisory employees who have offered evidence against them, in the form of: unsupported allegations of criminal activity in the anonymous unsworn statements; and an uncertified record from the Rapides Parish Sheriff's Office, and uncertified "investigative notes" and cell phone bills "kept in Fisher's employment file," all submitted by Defendants' attorney, Susan Fahey Desmond, with her unsworn statement (ECF No. 83-9).

Because the Court is considering a Motion for Collective Action, any statements or evidence that are irrelevant to the issues before the Court will not be considered.

Defendants submitted a pay statement for Plaintiff Williams (ECF No. 83-2 at 6), dated June 9, 2019 through June 22, 2019, that shows she had 8.2 hours of overtime in that pay period, and a total of 21.23 hours of overtime for the year to date, and was paid time-and-a-half for her overtime. Another pay statement for Williams (ECF No. 83-2 at 7) dated October 13, 2019 through October 26, 2019, shows Williams had 9.35 hours overtime in that pay period, and a total of 216.08 hours of overtime for the year to date, and was paid time-and-a-half. However, after deduction of "tips-makeup" and taxes, Williams' gross pay of $977.48 was reduced to net pay of $222.97. ECF No. 83-2 at 5. There are two other, similarly reduced pay statements showing "overtime" pay. ECF No. 83-2 at 6-7.

Defendants also submitted an earnings statement from a CC's Coffee barista (name redacted) that shows he or she received credit for overtime at a time-and-a-half pay rate in April 2021. ECF No. 83-3 at 6. An anonymous earnings statement for a Huddle House employee from August 30, 2020 through September 12, 2020 showed .21 hours of overtime were earned and paid. ECF No. 83-4 at 5. Another anonymous earnings statement for a Huddle House employee, from September 27, 2020 through October 10, 2020, showed 3.8 hours of overtime were earned and paid. ECF No. 83-4 at 6.

c.    **Employee handbooks**

Defendants also submitted the index and three pages from a D'Argent Companies Handbook that showed hourly employees would be paid overtime for

work beyond a forty-hour workweek, but that salaried employees would not be paid overtime and may be asked to work extra hours.  ECF No. 83-2 at 12.

Defendants submitted the index and two pages from a D'Argent Franchising Employee Handbook that showed overtime would be paid to "all non-exempt hourly workers" for work performed over 40 hours in a week.  ECF No. 83-2 at 19.

Defendants submitted part of the handbook from D'Argent Companies—Real Estate and Construction.  ECF No. 83-2.  That pages of the handbook submitted show "Section 8.02. (v.) Overtime pay is awarded to all non-exempt hourly workers for work performed over 40 hours in any given weekly time period."  ECF No. 83-2 at 19.

Defendants also submitted one page that appears to be from an employee handbook.  ECF No. 83-10.  However there is no cover page of any other identifying material attached to show what company the handbook applies to.  Because the Court cannot identify which manual or handbook the page is from or which company issued it, Exhibit 83-10 will not be considered.

### d.   Unauthenticated evidence

Defendants' attorney submitted an unsworn statement as to the authenticity of Tony Hunter's bank records, Tony Hunter's pay stub, a non-criminal investigation report from the Rapides parish Sheriff's office, and a copy of "investigative notes and cell phone bills" from Fisher's employment file.  ECF No. 83-9.  None of those records are certified by a records custodian or other qualified

person. Nor does that evidence appear to be relevant. Therefore, that evidence also will not be considered.

Finally, Defendants submitted portions of the transcripts of the depositions of Samantha Williams and Dakota Fisher. ECF No. 83-11. The court reporter's certification pages are missing. Because the transcripts are incomplete, uncertified, and not otherwise authenticated, they will not be considered. See Fed. R. Civ. P. 30(f) and 901(b).[16]

### e.  <u>Arguments</u>

Defendants argue the proposed class is not "similarly situated" because the workers have different jobs and different employers, and some are "salaried-exempt." Defendants contend Justin's testimony "proves" there was not a common practice or policy among the Defendants of failing to pay overtime.

Defendants contend Plaintiffs' "only evidentiary support" for the alleged "no overtime rule" are the unsworn statements of two former employees, whose

---

[16] "There can be no doubt but that the party who seeks to introduce written evidence must in some way authenticate it." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 307 (5th Cir.1978) (*citing Grey v. First National Bank of Dallas*, 393 F.2d 371, 386 (5th Cir.), *cert. den.*, 393 U.S. 961 (1968)). Under the exception, "(t)he testimony of the custodian or other qualified witness who can explain the record-keeping of the organization is essential. If the witness cannot vouch that the requirements of Rule 803(6) have been met, the entry must be excluded." *Coughlin*, 571 F.2d at 307 (*citing* 4 Weinstein, Evidence P 803(b)(02), at 803-143 (1972); *see also Burks v. Russell*, 2014 WL 6801718, at *3 (W.D. La. 2014); *United States. v. Iredia*, 866 F.2d 114, 120 (5th Cir. 1989). "A qualified witness is one who can explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met." *Iredia*, 866 F.2d at 120; *see also Burks*, 2014 WL 6801718, at *3 (*citing United States v. Brown*, 553 F.3d 768, 792 (5th Cir. 2008), *cert. den.*, 558 U.S. 897 (2009).

credibility Defendants attempt to impugn with allegations that they committed criminal offenses.  ECF No. 83 at 8-9.[17]   However, as discussed above, Plaintiffs have offered other evidence, including Justin Giallonardo's deposition.

Defendants also argue that Pigott and Molina were not paid overtime because they stole from the Defendants, thus forgoing any overtime.  However, when asked, Justin was not able to explain why they were not paid overtime before the point at which they were alleged to have stolen from Defendants.  Nor have Defendants offered any explanation as to why the value of the allegedly stolen property was not deducted from a paycheck that included overtime pay.

Defendants contend that Williams is not a proper class representative because: (1) she admitted she was paid overtime "at first"; (2) she worked for D'Argent Franchising and does not know anything about D'Argent Companies or D'Argent Construction; and (3) she engaged in an "inappropriate subordinate and supervisor sexual relationship" with Pigott.  Defendants have not explained why any of those contentions make Williams a legally inappropriate class representative.  Williams contends she was denied pay for overtime while she worked for D'Argent Franchising.  Therefore, she would be an appropriate class representative.

4.   <u>**The putative class of plaintiffs are similarly situated because are all subject to the same pay policies.**</u>

_____

[17] Defendants have not alleged or shown that any of the Plaintiffs have been convicted of the alleged criminal offenses.

Defendants argue the putative class is not similarly situated and that the different D'Argent companies cannot be sued together under the FLSA.

Plaintiffs contend the D'Argent Defendant businesses operated as a "single business enterprise." Plaintiffs contend the Defendant companies operated under, and subjected the proposed class to, the same pay policies and practices. The D'Argent Defendants argue that D'Argent Companies, D'Argent Franchising, and D'Argent Construction are "separate entities" with their own timekeeping systems, payroll providers, management structures and managers, location, schedules, handbooks, job titles and job descriptions, employment policies, and business services.

"[T]he Single-Business Enterprise doctrine is "a theory for imposing liability where two or more business entities act as one." *Premier Rotors, L.L.C. v. Black Star, L.L.C.*, 2019 WL 6724354, at *3 (W.D. La. 2019) (citing *Brown v. ANA Insurance Group,* 2007-C-2116 (La. 10/14/08), 994 So.2d 1265, 1266, n. 2, and *Green v. Champion Insurance Co.*, 577 So.2d 249, 257 (La. App. 1st Cir. 1991), *writ den.*, 580 So.2d 668 (La. 1991)); *see also Coleman v. Burgundy Oaks, L.L.C.*, 46,314 (La. App. 2 Cir. 6/8/11), 71 So.3d 352, 355 (*quoting Brown*, 994 So.2d 1265 n. 2). "Generally under the doctrine, when corporations integrate their resources in operations to achieve a common business purpose, each business may be held liable for wrongful acts done in pursuit of that purpose." *Id.*

"Louisiana law is determinative of whether entities constitute a 'single business enterprise.'" *Premier Rotors, LLC*, 2019 WL 6724354, at *3 (*citing Green*, 577 So.2d at 257). "A single business enterprise arises when a court finds that one corporation is the 'alter ego, agent, tool or instrumentality of another corporation.'" *Alack v. Jaybar, L.L.C.*, 2012 WL 13005346, at *3-*4 (E.D. La. 2012) (citing *Green*, 577 So. 2d at 257). "Generally, under this doctrine, when corporations integrate their resources to achieve a common business purpose and do not operate as separate entities, each affiliated business may be held liable for debts incurred and wrongful acts done in pursuit of that purpose." *Coleman*, 71 So.3d at 355 (*citing Brown v. Automotive Casualty Insurance Co.,* 93–2169 (La. App. 1st Cir.10/07/94), 644 So.2d 723, *writ denied,* 94–2748 (La.01/06/95), 648 So.2d 932); *Green*, 577 So.2d at 259. Hence, "[t]he 'single business enterprise' doctrine is essentially a theory for imposing liability where two or more business entities act as one." *Brown*, 994 So.2d at 1272; *see also Coleman*, 71 So.3d at 355.

As stated above, the single business enterprise theory is a theory for imposing liability on all for the acts of one. However, in this proceeding, Plaintiffs cite the single business enterprise theory as a reason to include all of the D'Argent businesses in their collective action – not as a reason to hold each of them liable for the acts of one. The single business enterprise theory is not an appropriate tool for defining the putative class.[18]

---

[18] The Court could not find another case that used the single business enterprise theory to define a putative class.

Instead, a court must consider whether the employees of the companies were "similarly situated." "Geographic commonality is not necessary to satisfy the FLSA collective action's 'similarly situated' requirement." *Vargas v. Richardson Trident Co.*, 2010 WL 730155, at *8–9 (S.D. Tex. 2010) (quoting *Sedtal v. Genuine Parts Co.,* 2009 WL 2216593 at *5 (E.D. Tex. 2009); *see also Falcon v. Starbucks Corp.,* 580 F. Supp. 2d 528, 539–40 (S.D. Tex. 2008).[19] "The fact that members of the putative collective class work in different facilities or have different job titles does not preclude a finding that they are similarly situated." *Spillers,* 2022 WL 1675950, at *3–4 (*citing Hamm,* 2021 WL 5749900, at 3. "Therefore, even when potential members' work settings differ, this circumstance will not weigh against a finding of sufficient similarity unless liability *turns on* those differences." *Spillers,* 2022 WL 1675950, at *3–4 (*citing Francis-Luster v. Kelley Law Firm, P.C.*, 2022 WL 822468, at *3 (N.D. Tex. 2022), *report and recommendation adopted*, 2022 WL 575566 (N.D. Tex. 2022)).

"The focus is on whether the employees were impacted by a common policy." *Id.* "When plaintiffs' claims are based on their employer's allegedly unlawful policy, the differences that are unrelated to the policy will not provide a basis for a court to find that the first factor weighs against a similarly situated finding." *Id.; see also Trottier v. FieldCore Services Solutions, L.L.C.,* 2022 WL 658765, at **2 (N.D. Tex.

---

[19] *Sedtal,* 2009 WL 2216593 at *5 (and cases cited therein) (concluding therefore that imposing geographic restrictions on discovery would be somewhat arbitrary and could obscure relevant information).

2022) ("similarly situated does not mean identically situated"); *Torres,* 2021 WL 3419705, at *5 ("where a plaintiff's claims are based on an employer's allegedly unlawful policy, noted differences between putative collective-action members that do not relate to the policy will not provide a basis for a court to find that the first factor weighs against a similarly situated finding").

The court should also consider if it can "coherently manage the class in a manner that will not prejudice any party." *Vargas*, 2010 WL 730155, at *8-*9 (*quoting Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 281 (N.D. Tex. 2008). In *Vargas, the* plaintiffs contended the defendants were three related companies that operated a metal distributorship and employed plaintiffs as manual labor. The defendants contended the companies were actually different divisions of one company, albeit with their own company names ("d/b/a"), and that they operated in 13 different facilities.

The court found the fact that the plaintiffs were all subjected to one common pay policy showed they were similarly situated, and that geographic location was not relevant. *See Vargas*, 2010 WL 730155, at *10; *see also Heeg v. Adams Harris, Inc.,* 907 F. Supp. 2d 856, 863 (S.D. Tex. 2012) (class of project professionals who worked for different companies in a number of different locations nationally were subjected to the same policy and therefore similarly situated); *Kaesemeyer v. Legend Mining U.S.A., Inc.,* 2018 WL 4347884, at *4 (W.D. La. 2018) (FLSA collective action brought against a company and a subsidiary company for illegal

pay policies and practices); *Gonzalez v. CNL Wings VII, Inc.,* 2015 WL 10818674, at

*1 (W.D. Tex. 2015) (recommending certification of an FLSA collective action of

against defendants who collectively operated fast food establishments under two

names, and those establishments included subsidiaries and affiliated companies).  A

case will have great manageability problems if there is no single decision, policy, or

plan that affects the plaintiffs. *See Vargas*, 2010 WL 730155, at *9 (*citing Proctor,*

250 F.R.D. at 281); *see also Basco,* 2004 WL 1497709, at *8.

Because Plaintiffs have shown the employees of all the D'Argent businesses

were subjected to the same employment policies, as set forth in the employee

handbooks provided by D'Argent Companies, they have shown the putative class of

D'Argent employees is similarly situated.  The evidence and four statements

submitted by Plaintiffs show overtime is not paid in the D'Argent businesses to any

employees, hourly or salaried.  It is not necessary for Plaintiffs to show the D'Argent

business were a "single business enterprise."[20]

---

[20] It is clear that the D'Argent businesses are all related.  D'Argent's website is titled:
"D'Argent Companies–Real Estate & Construction," and shows that Thomas Giallonardo III
is the founder, Thomas Giallonardo IV is "president of construction," and Justin
Giallonardo is "president of real estate."  D'Argent Companies is located at 1460 Centre
Court in Alexandria, Louisiana.  *See* www.dargentco.com.  D'Argent Franchising is not
listed on the website, although it is owned by D'Argent Companies (Thomas Giallonardo
III).

The Louisiana Secretary of State further shows that D'Argent Companies, L.L.C. was
formerly named "D'Argent Development, L.L.C. (changed 2/6/2019)" and before that it was
"D'Argent Properties, L.L.C. (registered in 2004, named changed 3/12/2012)."  The
registered agent and sole officer/member is Thomas Giallonardo III of 1460 Center Court in
Alexandria, Louisiana.

Defendants do not argue that Plaintiffs have not stated a claim for violation of the FLSA's overtime provisions.  Instead, they contend that, to define the collective, the Court must now decide ultimate factual issues that should not be dealt with  until trial.  Defendants contend it is inappropriate for the Court to decide those issues of fact at this stage. The Court in *Swales* found otherwise.

"The trial court's notice-giving role is pivotal to advancing the goals and evading the dangers of collective actions. An employee cannot benefit from a collective action without 'accurate and timely notice.'"  *See Swales,* 985 F.3d at 435 (*citing Hoffmann-La Roche, Inc.,* 493 U.S. at 170).  "[A] trial court can better manage a collective action 'if it ascertains the contours of the action at the outset.' 'Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed.'"  *Swales,* 985 F.3d at 435 (*quoting Hoffman-LaRoche, Inc.,* 493 U.S. at 172).  "[T]he district court has broad, litigation-

---

The Louisiana Secretary of State shows that D'Argent Franchising was registered in 2016; it is located at 1460 Centre Court in Alexandria, Louisiana; the registered agent is Thomas Giallonardo III of 1460 Centre Court in Alexandria; and the sole officer/member is D'Argent Development, L.L.C. (now D'Argent Companies) of 1460 Centre Court in Alexandria. As stated above, D'Argent Development has been renamed "D'Argent Companies," of which Thomas Giallonardo III (of 1460 Centre Court in Alexandria) is the sole officer/member.

The Louisiana Secretary of State further shows that D'Argent Construction, L.L.C. was registered in 2005 as Thomas Giallonardo, L.L.C. (changed 12/3/2007).  It is located at 1460 Center Court in Alexandria, Louisiana, the registered agent is Corporation Service Company in Baton Rouge, and the sole officer/member is Thomas J. Giallonardo III of 1460 Center Court in Alexandria.

Justin testified in deposition that: Thomas Giallonardo III owns 80% of D'Argent Companies, and Justin and Thomas Giallonardo IV each own 10%; Thomas Giallonardo III owns 100% of D'Argent Franchising; and Thomas Giallonardo owns 80 of D'Argent Construction, and Thomas Giallonardo IV and Justin each own 10%.  ECF No. 77-6 at 4.

management discretion here." *Swales,* 985 F.3d at 443. Therefore, the trial court is authorized to consider all evidence and resolve any issues that can be resolved before the notice is sent out.

The issues regarding intentional reduction of employees' overtime pay through purposeful cutting of time from payroll records are better resolved at trial. They go to the issue of willfulness and punitive damages. The issues regarding whether employees classified as "salaried-exempt" are entitled to overtime can only be settled after notice goes out and such potential plaintiffs opt-in. Defendants' classification of employees as exempt solely because they are "salaried" is overly simplistic and erroneous under the FLSA. *See Helix Energy Solutions Group, Inc.,* 143 S. Ct. at 678 (see § 541.600(a) and § 541.601(b)(1) for the minimum compensation requirement to meet the salary exemption) with § 541.100(a)(1) (requiring payment "on a salary basis at a rate of not less than $455 per week"); *see also* 29 C.F.R. § 541.3 (defining the scope of the exemptions); *Spillers,* 2022 WL 1675950, at *6–7.

In any event, Defendants' contention that "ultimate issues of fact are for consideration at trial" is incorrect in light of the Fifth Circuit's opinion in *Swales*. "[T]he FLSA's similarity requirement is something that district courts should rigorously enforce at the outset of the litigation." *Swales*, 985 F.3d at 443. Thus, "[t]o determine whether and to whom notice should be issued . . . the district court needs to consider all of the available evidence." *Swales*, 985 F.3d at 442.

D'Argent's only factual argument is that Plaintiffs' proposed class is overbroad because it includes D'Argent Companies, which did not have any employees until 2021. However, Justin testified at deposition that D'Argent Companies is over the other companies. D'Argent Companies employees two administrative assistants, an Operations Coordinator who maintains the buildings and collects rent, a Chief Financial Officer/Human Resources Officer/Officer Manager (there had been four as of the time of the deposition), a Maintenance Tech (who maintains the properties), and Justin Giallonardo. ECF No. 77-6 at 5-14. Therefore, it appears that D'Argent Companies did, in fact, have employees before 2021.

Because Plaintiffs have shown there is a class of similarly situated plaintiffs who were subject to the same pay practices within D'Argent Companies, D'Argent Construction, and D'Argent Franchising, Plaintiffs' Motion for Collective Action Certification (ECF No. 77) is GRANTED.

### B. Plaintiffs' Motion for Equitable Tolling of Putative Class Members' FLSA Claims (ECF No. 93) is DENIED.

Plaintiffs filed a "Motion for Equitable Tolling of the Putative Class Members FLSA Claims." ECF No. 93. Plaintiffs seek to increase the statutory period for claims on the basis that Defendants have delayed discovery, failed to comply with the Court's discovery order, and created unnecessary discovery and motion practice. ECF No. 93-1. Plaintiffs also cite the delays in rulings resulting from the Court's docket. ECF No. 93-1.

"[P]laintiffs must 'opt in' to an FLSA collective action." *Sandoz v. Cingular Wireless, L.L.C.*, 2014 WL 3045532, at *5 (W.D. La. 2014), *aff'd*, 675 Fed. Appx. 448 (5th Cir. 2017), *opinion amended and superseded on denial of reh'g,* 700 Fed. Appx. 317 (5th Cir.2017), and *aff'd*, 700 Fed. Appx. 317 (5th Cir. 2017). "The filing of a class action under Federal Rule of Civil Procedure 23 tolls limitations for putative class members. Such tolling is justified because '[o]therwise, class members would be led to file individual actions prior to denial of class certification, in order to preserve their rights. The result would be a needless multiplicity of actions-precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid.'" *Sandoz*, 2014 WL 3045532, at *5 n. 2 (*citing Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 345 (1983)).

"The doctrine of equitable tolling preserves a plaintiff's claim when strict application of the statute of limitations would be inequitable." *Vargas*, 2010 WL 730155, at *9 (*citing United States v. Patterson,* 211 F.3d 927, 930 (5th Cir. 2000)). Equitable tolling is a very narrow exception to the FLSA statute of limitations, for which "a plaintiff must show: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Sandoz,* 700 Fed. Appx. at 320 (*citing Menominee Indian Tribe of Wisconsin v. United States,* 577 U.S. 250, 255 (2016)). "This standard requires 'reasonable diligence,'" not "maximum feasible diligence,' and extraordinary circumstance that derives from some 'external obstacle to timely filing . . . beyond

48

the plaintiff's control,' not from self-inflicted delay." *Id.; see also Holland v. Florida*, 560 U.S. 631, 653 (2010).

"Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996); *see also Vargas*, 2010 WL 730155, at *9 (quoting *Patterson*, 211 F.3d at 930–31). "Equitable estoppel prevents a defendant from asserting a limitations defense when its conduct induced or tricked a plaintiff into allowing a filing deadline to pass." *Sandoz*, 700 Fed. Appx. at 321 (*citing McAllister v. F.D.I.C.*, 87 F.3d 762, 767 (5th Cir. 1996); *see also Dukes v. City of Lumberton*, 2017 WL 6373982, at *2 (S.D. Miss. 2017). "[I]t typically applies only when a defendant makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it, and the person does, in fact, reasonably rely." *Id.*

"Equitable tolling of the statute of limitations is based on the principle that no one 'may take advantage of his own wrong.'" *Coke v. General Adjustment Bureau, Inc.,* 640 F.2d 584, 596 (5th Cir. 1981) (quoting *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232 (1959)); *see also Escobedo v. Dynasty Insulation, Inc.*, 694 F. Supp. 2d 638, 653 (W.D. Tex. 2010). Thus, "[e]quitable tolling focuses on the employee's ignorance, [and] not on any possible misconduct by

the employer." *Rhodes v. Guiberson Oil Tools Division,* 927 F.2d 876, 878 (5th Cir. 1991); *Escobedo*, 694 F. Supp. 2d at 653.

"The party invoking equitable tolling bears the burden of justifying the need for equitable tolling of the limitations period, but the decision to ultimately invoke equitable tolling in a particular instance is left to the discretion of the district court, subject to appellate review only for abuse of discretion." *Hamm*, 2022 WL 2713532, at *4-5.

Plaintiffs have failed to show extraordinary circumstances that caused delays. "[D]elays in certifying a class do not present extraordinary circumstances justifying equitable tolling." (citing *Hamm*, 2022 WL 2713532, at *5 (E.D. La. 2022) (*citing White v. Integrated Electronic Technologies, Inc.*, 2015 WL 4254123, at *3 (E.D. La. 2015)); *see also Roberts v. Baptist Healthcare System, L.L.C.*, 2022 WL 4493733, at *3 (E.D. Tex. 2022), *report and recommendation adopted,* 2022 WL 4491070 (E.D. Tex. 2022); *Sandoz,* 2014 WL 3045532, at *1; *Clay v. Huntington Ingalls, Inc.*, 2012 WL 860375, at *4 (E.D. La. 2012); *Vargas*, 2010 WL 730155, at *9. Moreover, protracted litigation and opposition to certification and notice do not constitute external obstacles that preventing timely filing. *Robinson v. RWLS, L.L.C.,* 2017 WL 1535072, at *1 (W.D. Tex. 2017) (*citing Phillips v. Leggett & Platt, Inc.,* 658 F.3d 452, 457 (5th Cir. 2011)); *see also Sandoz,* 700 Fed. Appx. at 321. "Routine litigation is not an extraordinary circumstance." *Sandoz*, 700 Fed. Appx. at 321. Nor does a "garden variety claim of excusable neglect" warrant equitable

50

tolling. *Holland,* 560 U.S. at 651-62. Protracted litigation can constitute an extraordinary circumstance, but only when a defendant's conduct "induced or tricked a plaintiff into allowing a filing deadline to pass." *Robinson*, 2017 WL 1535072, at *2 (*citing McAllister*, 87 F.3d at 767).

Plaintiffs have failed to state facts supporting the imposition of equitable tolling. They complain of delays caused by motion practice, the Court's docket, and Defendants' failure to comply with discovery requests and orders. But they do not show that potential opt-in plaintiffs were unaware of their rights, barred from asserting their rights, or have been diligently pursuing their rights but have been prevented from joining the action due to reasons beyond their control. *See White*, 2015 WL 4254123, at *3 (*citing Mejia v. Brothers Petroleum, L.L.C.*, 2014 WL 3853580, at * (E.D. La. 2014)); *see also Hamm,* 2022 WL 2713532, at *4 n. 56–*5; *Sandoz*, 700 Fed. Appx. at 321.

Because Plaintiffs have not alleged an extraordinary circumstance that actively misled and prevented the putative plaintiffs from timely filing their lawsuits, Plaintiffs' Motion for Equitable Tolling (ECF No. 93) is DENIED.

### C.   Plaintiffs' Motion to Compel Discovery is GRANTED and their Motion for Attorney Fees is DENIED.  ECF No. 68.

Plaintiffs ask the Court to Compel Defendants to comply with the Court's Order (ECF No. ) to provide discovery as specified in the Order.  Defendants did not do so, instead heavily redacting–without authorization from the Court–the items

they provided.  According, Plaintiffs' Motion to Compel Discovery (ECF No. 68) is GRANTED.

Because this case is no longer in a pre-certification stage, regular full discovery shall take place.

Defendants are ORDERED to provide to Plaintiffs, within **21 days of the date of this order,** unredacted copies of all of the discovery previously requested by Plaintiffs that falls within the parameters of the Court's Order (ECF No. 62).

Moreover, regular discovery shall proceed.  Defendants are ORDERED to provide unredacted copies to Plaintiffs, unless the redactions are specifically authorized by statute or authorized by the Court.  Further unwarranted redactions may result in sanctions.

Plaintiffs' Motion for Attorney Fees is DENIED.  The Court was able to rule on the Motion for Certification without further discovery from Defendant.

## III.   Conclusion

IT IS ORDERED that Plaintiffs' Motion to Certify a Collective Action (ECF No. 77) is GRANTED.

IT IS FURTHER ORDERED that, within seven days of the date of this Order, the parties will jointly file a proposed notice for the Court's consideration.

IT IS ORDERED that Plaintiffs' Motion for Equitable Tolling (ECF No. 93) is DENIED.

IT IS ORDERED that Plaintiffs' Motion to Compel Discovery is GRANTED

and that Plaintiffs' Motion for Attorney Fees is DENIED (ECF No. 68).

      SIGNED on April 21, 2023.

_____

Joseph H.L. Perez-Montes
United States Magistrate Judge